**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEBRASKA**

| | |
|---|---|
| JESSICA OLSEN, on behalf of herself and the class members described herein, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| | ) Demand for Trial by Jury |
| NELNET, INC., a Nebraska Corporation, | ) Designation: Trial Location |
| NELNET DIVERSIFIED SOLUTIONS, LLC, | )          Lincoln, Nebraska. |
| a Nebraska limited liability company, and | ) |
| NELNET SERVICING LLC, a Nebraska | ) |
| limited liability company. | ) |

Defendants.

## CLASS ACTION COMPLAINT

1.     Plaintiff JESSICA OLSEN brings suit against Defendants, NELNET, INC., a Nebraska Corporation, NELNET DIVERSIFIED SOLUTIONS LLC, a Nebraska limited liability company, and NELNET SERVICING, LLC, a Nebraska limited liability company, alleging that Defendants 1) breached their servicing contract with the federal government, of which Plaintiff was an intended third party beneficiary; 2) breached and/or tortiously interfered with written agreements between the federal government and student loan borrowers, namely Plaintiff; and 3) violated various state and federal laws in connection with the servicing of Plaintiffs' federal student loans.

## NATURE OF THE ACTION

2.     Student loan debt is now the largest category of non-housing related consumer debt in the United States with more than $1.34 trillion outstanding at the end of June 2017. The overwhelming majority of student loans in the United States are owned or guaranteed by the federal government through the U.S. Department of Education.

1

3.     Since June 2009, Defendant Nelnet Inc., and its subsidiaries, Nelnet Servicing LLC and Nelnet Diversified Solutions, LLC, acting as agents on behalf of Nelnet Inc., have jointly served as one of four primary servicers of federal student loan debt.

4.     Loan servicers who contract with the Department of Education perform all tasks associated with loan repayment, such as collecting payments, responding to customer service inquiries, providing loan documents to borrowers, handling applications for loan deferment or forbearance based on financial hardship, and administering repayment programs designed to help borrowers effectively manage the increasing cost of higher education. This includes the various Income-Driven Repayment Plans ("IDR plans") offered by the federal government, which provide qualifying borrowers with relief from student loan debt by adjusting their payments to a reasonably affordable amount based on their income, occupation, and family size. Borrowers enrolled in IDR plans can also apply to have their federal loans forgiven after a certain number of payments.

5.     Defendant Nelnet Inc. and/or its subsidiaries, Nelnet Servicing LLC and Nelnet Diversified Solutions, LLC, acting as agents on behalf of Nelnet Inc., received and continue to receive monthly servicing fees for the federal loans that they administer.  Thus, Defendants have a strong financial interest in keeping loans active for as long as possible to continue collecting these monthly fees.  To that end, Defendant Nelnet Inc., through its subsidiaries, Nelnet Servicing LLC and Nelnet Diversified Solutions, LLC, acting as agents on behalf of Nelnet Inc., failed to properly process IDR plan applications, or delayed the processing of these applications, in order to generate additional monthly servicing fees.  Because loan payments only count toward forgiveness once a borrower's application is processed, this practice extended the

duration of loans in the various IDR programs, and injured borrowers who were required to make additional payments on loans that otherwise would have been forgiven at a sooner date.

6.     Defendant Nelnet Inc., through its subsidiaries, Nelnet Servicing LLC and Nelnet Diversified Solutions, LLC, acting as agents on behalf of Nelnet Inc., also improperly placed the loans of borrowers making timely payments into deferment or forbearance status – a designation typically reserved for situations where the borrower seeks relief from its payment obligations due to financial hardship. Borrowers who are in deferment or forbearance cannot make qualifying payments that count toward loan forgiveness under the various IDR plans, even though Nelnet continues to collect fees for servicing their loans.  Thus, Nelnet's abuse of the deferment and forbearance process, through its agents, Nelnet Servicing LLC and Nelnet Diversified Solutions LLC, artificially increased Defendants' revenue and extended the duration of the borrowers' loans in the various IDR programs. Moreover, at the conclusion of each forbearance, any accrued interest is "capitalized," or added to the borrower's principal loan balance, which may increase the borrower's debt load considerably.  Thus, Defendants' abuse of the forbearance process artificially increased the principal loan balance of its borrowers, putting them deeper and deeper into debt.

7.     The aforementioned practices caused borrowers to suffer measurable financial harm when: (a) the duration of their loans was extended; (b) interest accrued on the principal balance of loans during unnecessary periods of deferment or forbearance; (c) monthly payments under IDR programs were billed at inaccurate levels; and (d) borrowers were charged additional fees due to the delay in processing their applications for IDR programs.  As a result, Plaintiff and the Class have either lost out on months or years of qualifying loan payments that would have brought them closer to loan forgiveness under their IDR programs; been overcharged; or

3

otherwise disadvantaged when they were unable to utilize federal programs designed to make their education more affordable.

8.      Reports published by the Consumer Financial Protection Bureau ("CFPB") describe complaints from borrowers nationwide of identical, widespread misconduct by loan servicers, including Nelnet, in their exploitation of the various IDR programs.  Specifically, the Student Loan Ombudsman of the Consumer Financial Protection Bureau ("CFPB") received 3,900 complaints from federal student loan borrowers between March 1, 2016 and August 31, 2016 relating to problems managing or repaying federal student loans. *See* Annual Report of the CFPB Student Loan Ombudsman, October 2016, available at https://www.consumerfinance.gov/data-research/research-reports/2016-annual-report-cfpb-student-loan-ombudsman/ (last visited May 8, 2018).   An analysis of these complaints found that consumers with student loans identified a range of problems with customer service, borrower communications, and income-driven repayment (IDR) plan enrollment. *Id.*

9.      An analysis of 1,062 consumer complaints made against the top ten student loan servicers, including Defendants, found that the most commonly cited issue was problems involving the processing and management of IDR plans. *Id.* Indeed, between March 1, 2016 and August 31, 2016, the second most common complaint made against Defendants involved difficulties relating to enrollment in, and renewal of, IDR plans.  *Id.*

10.      Between September 1, 2016 and August 31, 2017, the Consumer Financial Protection Bureau ("CFPB" or "Bureau") handled approximately 12,900 federal student loan servicing complaints.  Consumers identified IDR plan enrollment problems as one of their most common complaints. *See* Annual Report of the CFPB Student Loan Ombudsman, October 2017, available    at    https://files.consumerfinance.gov/f/documents/cfpb_annual_report_student-loan-

ombudsman_2017.pdf. (last visited May 8, 2018). According to the report, "borrowers continue to complain to the Bureau that servicing roadblocks may delay or block their ability to make income-driven payments." *Id.*

11.    According to the 2017 report, Nelnet received over six hundred complaints from federal student loan borrowers between September 1, 2016 and August 31, 2017. *Id.* Seventy-nine percent of these complaints involved difficulties that borrowers encountered in dealing with their lender or servicer. *Id.*

12.    As detailed in the aforementioned reports, and as revealed through the independent investigation of Plaintiff's counsel, Defendants have violated federal and state law in connection with their servicing of federal student loans in that they failed to promptly process borrowers' requests to renew their IDR plans, unlawfully cancelled borrowers' income-driven payments due to processing errors, unlawfully capitalized interest that accrued on borrowers' accounts, and unlawfully applied forbearances to borrowers' accounts during processing delays.

13.    These abusive practices caused borrowers to suffer measurable financial harm when: (a) the duration of their loans was extended; (b) interest accrued on the principal balance of loans during unnecessary periods of deferment or forbearance; and (c) they were charged additional fees and higher monthly payments due to the delay in processing their applications for IDR programs.

14.    As a result, Plaintiffs and the Class have also lost out on months or years of qualifying loan payments that would have brought them closer to loan forgiveness under the various IDR programs; been overcharged; or otherwise disadvantaged when they were unable to utilize federal programs designed to make their education more affordable.

15.    Based on the continuing complaints described by the CFPB and pervasive nature

5

of the misconduct set forth herein, Plaintiffs believe that further evidentiary support for their claims will be revealed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this lawsuit has been brought as a class action on behalf of proposed classes each in excess of 100 members; the aggregate claims of the Class members exceed $5 million exclusive of interest and costs; and one or more of the members of each Class is a citizen of a different state than one or more Defendants.

17.     This Court has personal jurisdiction over Defendants because they are incorporated in the State of Nebraska and are therefore residents of this District, and also because a substantial part of the events or omissions giving rise to the unlawful conduct alleged in this Complaint occurred in this District.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 139l(b) because a substantial part of the events or omissions giving rise to the unlawful conduct alleged in this Complaint occurred in this District.

## PLAINTIFF – JESSICA OLSEN

19.     Jessica Olsen is a resident of the State of Oregon, where she resided at all times relevant hereto.  In or around 2004 she took out a Federal Direct Consolidation Loan, which consolidated multiple federal loans into a single loan.  The consolidation loan is governed by a standard promissory note, a contract between Plaintiff and the federal government, which is also binding on Defendants pursuant to *Mirandette v. Nelnet, Inc.*, 2018 WL 459714.

6

<u>**DEFENDANTS**</u>

20.     Nelnet Inc. was founded as the UNIPAC Loan Service Corporation in 1978 and renamed Nelnet in 1996.  It became a publicly traded company in 2003.

21.     Nelnet Inc. owns over 50 subsidiaries that administer and collect student loans throughout the United States and Canada, including Nelnet Servicing LLC and Nelnet Diversified Solutions LLC.

22.     Nelnet Servicing LLC is a wholly-owned subsidiary of Nelnet Diversified Solutions LLC, which is itself a wholly-owned subsidiary of Nelnet Inc.

23.     In 2009, a Student Loan Servicing Contract was executed between the United States Department of Education and Defendants.  *See* Servicing Contract, attached as Exhibit A. This contract governs the Defendants' administration of federal student loans, and remains in full force and effect.  The contract was extended and modified in 2014.

24.     In its 10-K filings with Securities and Exchange Commission for 2016, available at  https://s21.q4cdn.com/368920761/files/doc_financials/annual/2016/2016_Annual_Report.pdf (last visited May 7, 2018), Nelnet Inc. held itself out as one of the four servicers of federal student loans owned by the Department of Education, which business Nelnet Inc. conducts through its agents/subsidiaries, Nelnet Diversified Solutions LLC and Nelnet Servicing LLC, as evinced by the following statements:

       a.     "The Company is one of four private sector companies (referred to as Title IV Additional Servicers, or "TIVAS") awarded a student loan servicing contract by the Department [of Education] in June 2009 to provide additional servicing capacity for loans owned by the Department [of Education] . . . [t]hese loans include Federal Direct Loan

Program loans originated directly by the Department and FFEL Program loans purchased by the Department."

b.    "As a student loan servicer for the federal government and for financial institutions, including the Company's FFELP student loan portfolio, the Company is subject to the Higher Education Act and related laws, rules, regulations, and policies."

c.    "The Company has designed its servicing operations to comply with the Higher Education Act, and it regularly monitors the Company's operations to maintain compliance."

d.    "The company earns fee-based revenue through…Nelnet Diversified Solutions ("NDS")."

e.    Nelnet Diversified Solutions (NDS) is the largest fee-for-service business at Nelnet. The NDS segment provides federal student loan servicing for the Direct Loan Program, FFEL Program, and consumer loan servicing for private lenders and banks."

f.    "As of December 31, 2016, the Company was servicing $162.5 billion of student loans for 6.0 million borrowers under this contract. The Department is the Company's largest customer, representing approximately 20 percent of the Company's revenue in 2016."

25.    As the above excerpts demonstrate, Nelnet Inc. holds itself out as the entity responsible for servicing loans owned and guaranteed by the federal government, pursuant to its 2009 servicing contract with the Department of Education, and that its wholly-owned subsidiaries, Nelnet Diversified Solutions LLC and Nelnet Servicing LLC, are agents acting on behalf of Nelnet Inc. to perform its obligations under the contract.

8

26.     All Defendants are incorporated, and have their principal place of business, in Lincoln, Nebraska, at 121 S. 13th Street, Suite 201, Lincoln, Nebraska 68508.  Defendants are, at times, hereinafter referred to collectively as "Nelnet."

## SUBSTANTIVE ALLEGATIONS

27.     The average annual cost of higher education in the United States has increased at a significantly greater rate than inflation for several decades. For example, a recent study by the College Board shows that the inflation-adjusted cost of attending a private four-year, public four year, or public two-year institution has more than tripled since 1970.  See *Tuition and Fees and Room and Board over Time*, Table 2, (Released 2017), The CollegeBoard, available at https://trends.collegeboard.org/college-pricing/figures-tables/tuition-fees-room-and-board-over-time (last visited May 8, 2018).

28.     Students have increasingly come to rely on student loans to pay for their higher education.  The overwhelming majority of student loans in the United States are owned or guaranteed by the federal government through the U.S. Department of Education.  They come with an array of repayment options to fit a student borrower's short-term and long-term needs.

29.     The "standard repayment plan" for federal student loans is the default payment plan.  Under the standard repayment plan, monthly payments are calculated such that the borrower's balance is fully paid within 10-30 years. Many borrowers who cannot afford payments under the standard plan enroll in various IDR plans that offer significantly lower monthly payments.  For instance, under the "Income Based Repayment" plan, the borrower's monthly payments are capped at fifteen percent of discretionary income, and the remaining debt is discharged after twenty-five years of qualifying payments.  Under some IDR plans, monthly payments can be as low as zero dollars per month.

9

30.     When borrowers enroll in an IDR plan, the plan is effective for a one-year period. To renew the plan for each subsequent year, borrowers must annually recertify their income by submitting a new IDR request form with proof of income to their loan servicer.  *See* 34 C.F.R. §685.221(e)(3).

31.     Two to three months prior to the expiration of the IDR plan, the loan servicer must send the borrower a written notice of the "annual deadline" by which the borrower must recertify the plan in order to continuing making income-driven payments.  *See* 34 C.F.R. §685.221(e)(3)(i).  This notice must include the consequences of failing to renew the IDR plan by the stated deadline.  One of these consequences includes an increase in monthly payments from a low affordable amount to the amount dictated by the standard ten-year repayment plan. *See* 34 C.F.R. § 682.215 (e)(3)(ii). Additionally, any accrued interest is capitalized, or added to the borrower's principal loan balance, when an IDR plan is not timely renewed before its expiration. *See id*.

32.     In view of these consequences, federal law provides certain protections for borrowers enrolled in IDR plans.  First, when the loan servicer receives a borrower's timely request to renew the plan, the loan servicer is prohibited from cancelling the borrower's income-driven payment amount while the request is being processed.  Rather, the loan servicer "must maintain the borrower's current scheduled monthly payment amount" until the request has been fully processed.  *See* 34 C.F.R. §685.221(e)(8)(ii).  Second, the loan servicer must "promptly" determine the new monthly payment amount*. See* 34 C.F.R. §685.221(e)(8)(i).  To that end, the Department of Education has directed loan servicers to process IDR requests within 10 business days.  *See* U.S. Department of Education, Memorandum from U.S. Department of Education Under Secretary Ted Mitchell on Policy Direction on Federal Student Loan Servicing (July 20,

2016), available at http://www2.ed.gov/documents/press-releases/loanservicing-policy-memo.pdf. (last visited May 3, 2018).

33.     In contrast to IDR plans, which provide affordable monthly payments, borrowers may have their loans placed into temporary forbearance status. *See* 34 C.F.R. §685.205(a). This allows borrowers to temporarily cease making payments during periods of hardship. *See id*. Forbearances, however, delay progress toward loan forgiveness and can be very costly for borrower. This is because any unpaid interest that accrues during the forbearance gets "capitalized," or added to the borrower's loan balance. *See id*. On the other hand, forbearances are highly lucrative for the loan servicer because they extend the period of repayment, generating additional monthly servicing fees.

## DEFENDANTS' CONTRACT WITH THE DEPARTMENT OF EDUCATION

34.     The Department of Education awarded a servicing contract in 2009 ("servicing contract") to Nelnet Servicing LLC. *See* servicing contract attached as Exhibit A. The servicing contract continues to be in force to the present, subject to various modifications. Nelnet Servicing LLC performs Nelnet's obligations under the contract as an agent of, and on behalf of, Nelnet Diversified Solutions LLC and Nelnet Inc.

35.     The servicing contract requires Defendants to maintain a full understanding of all applicable federal regulations, meet all statutory and legislative requirements, and ensure that all aspects of the service continue to remain in compliance as changes occur. It also states that borrowers whose loans are not being serviced in compliance with the "requirements, policy and procedures" for servicing federally held debt will not be billable to the Government from the initial point of non-compliance. *Id*. at page 12.

36.     Under the servicing contract, the Department of Education pays Nelnet an average monthly fee for each of the borrowers whose loans Defendant services. That fee depends on the status of the loan and the total volume of loans from the category being serviced. For example, the contract's fee schedule is represented in the table below. This table includes a "unit price," or monthly payment due to the loan servicer, for loans in seven different status categories, including "in-school status," "grace or current repayment status," "deferment or forbearance," and varying durations of delinquency:

**FIGURE 1**

| Status | Volume Low | Volume High | Unit Price |
|--------|------------|-------------|------------|
| Borrowers in in-school status | N/A | N/A | $1.050 |
| Borrowers in grace or current repayment status | 1 | 3,000,000 | $2.110 |
|  | 3,000,001 | UP | $1.900 |
| Borrowers in deferment or forbearance | 1 | 1,600,000 | $2.070 |
|  | 1,600,000 | UP | $1.730 |
| Borrowers 31-90 days delinquent | N/A | N/A | $1.620 |
| Borrowers 91-150 days delinquent | N/A | N/A | $1.500 |
| Borrowers 151-270 days delinquent | N/A | N/A | $1.370 |
| Borrowers 270+ days delinquent | N/A | N/A | $0.500 |

37.     As illustrated in Figure 1, Defendants are compensated on a "per unit" basis, with a directly proportional relationship between revenue and the number of borrowers that maintain an active loan balance. This fee structure gives Nelnet a financial incentive to maintain or increase the number of borrowers in its portfolio, while minimizing the number of borrowers who successfully earn loan forgiveness or otherwise discharge their loans. These loan programs

benefit borrowers by making higher education more affordable for those who want to serve the public.  However, helping borrowers get out of debt sooner directly conflicted with Nelnet's own financial interest in keeping loans active for as long as possible to continue collecting monthly servicing fees.  In other words, while borrowers enroll in IDR plans to earn loan forgiveness, and maintain affordable monthly loan payments, Nelnet has the opposite incentive: to keep loans active for as long as possible to continue earning servicing fees.  From Nelnet's perspective, every time a borrower repays her loan in full, or receives loan forgiveness under one of the federal programs it administers, Nelnet loses a loan from its servicer portfolio, a vital source of its revenue.

38.     The servicing contract also created a financial incentive to place borrowers into deferment or forbearance status to further increase servicing fees. For example, Figure 1 shows that the unit price paid

39.     to Nelnet for servicing each loan depends on the loan's status (*e.g.*, current repayment, deferment, or forbearance) and the total number of loans in its portfolio that are part of the same category.  Under the fee schedule, once the total amount of loans in active repayment or grace period status exceeded 3,000,001, Nelnet received a *lower* unit price per loan than it did for loans in deferment or forbearance. Thus, once the 3,000,001-loan threshold was reached, each loan that Nelnet moved from active repayment or grace period status into deferment or forbearance generated additional revenue, even though it prevented borrowers from making qualified payments toward loan forgiveness. (The Department of Education subsequently revised the contract in 2014 to remove this incentive by lowering the amount it paid for loans in deferment or forbearance to an amount below that of loans in active repayment.  However, it maintained the same overall structure of compensating Nelnet based on the number of loans in

its portfolio, continuing to motivate Navient Corp. to ensure that borrowers remained in debt as long as possible.)

40.    The failure of Defendants to timely and properly process IDR plan applications deprived borrowers of the opportunity to make qualifying monthly payments that count toward loan forgiveness. To accommodate these processing delays, and increase its own revenue, Nelnet put borrowers' accounts into deferment or forbearance status under circumstances that are not permitted by federal law, which prevented these borrowers from making monthly payments. These borrowers have therefore lost out on months or years that would otherwise count toward achieving loan forgiveness.

### CLASS REPRESENTATIVE ALLEGATIONS – JESSICA OLSEN

41.    Jessica Olsen's college education was financed by federal student loans, which were consolidated by into a Federal Direct Consolidation Loan in or around 2004, which is governed by a standard promissory note.  The promissory note states that it is to be interpreted in accordance with applicable federal statutes and regulations.

42.    In 2014, Ms. Olsen applied to enroll in the Income Based Repayment (IBR) plan, one of the various IDR plans implemented by the federal Department of Education.  Under the IBR plan, borrowers generally make monthly payments in the amount of fifteen percent of their discretionary income, and their loans are forgiven after twenty-five years of qualifying payments under the plan.  For low-income borrowers, monthly payments under the IBR plan can be as little as $0 per month.

43.    In 2014, Ms. Olsen's IBR application was approved, and her IBR plan took effect on March 7, 2014, with monthly payments of $0 per month on account of her low income.  The plan was scheduled to expire after one year unless timely renewed by Ms. Olsen.

14

36.     On December 5, 2014, Ms. Olsen received a letter from Nelnet notifying her that her IBR plan would soon expire unless all necessary renewal documentation was submitted within ten days of January 31, 2015.  *See* Renewal Notice, attached as Exhibit B.  Thus, the effective deadline by which Ms. Olsen was required to submit her IDR application was February 10, 2015.  The letter advised that Ms. Olsen could submit her renewal application via the Department of Education's website at www.StudentLoans.gov.

37.     On February 9, 2015, Defendants capitalized $8,669.08 of accrued interest on Ms. Olsen's loans because she had not yet submitted a written request to renew her IBR plan, even though her annual renewal deadline had not yet arrived.  At or around this time, Defendants also cancelled Ms. Olsen's income-based monthly payments and increased her payment amount to $968.10, the amount she would have owed each month under the standard repayment plan.

38.     On February 10, 2015, Ms. Olsen electronically submitted her IBR renewal request via the Department of Education's website, as instructed on the renewal notice.  She received a confirmation email on said date, confirming that her application was received and sent to her participating servicer.  *See* Confirmation Email, attached as Exhibit C.

39.     Because Ms. Olsen electronically submitted her renewal request within ten days of January 31, 2015, her submission was timely, and she was entitled to have her IBR plan renewed for the following year.  Nonetheless, Defendants cancelled her income-based monthly payments, increased her payment amount to $968.10, and capitalized $8,669.08 of accrued interest on Ms. Olsen's loans.

40.     Under federal law, if the Department of Education receives the borrower's IDR renewal application within ten days of the specified annual deadline, the borrower's loan servicer must promptly determine the new monthly payment amount, and must maintain the borrower's

15

current scheduled monthly payment amount until the new scheduled monthly payment amount is determined. *See* 34 C.F.R. §685.221(e)(8)(ii).  Ms. Olsen made a timely submission of her recertification materials, but Defendants nonetheless cancelled her income-based monthly payments, resulting in the addition of thousands of dollars of unpaid interest to Ms. Olsen's principal loan balance, and her inability to make qualifying payments in the months that followed.

41.     By late April of 2017, Defendants still had not resumed Ms. Olsen's income-based monthly payment amount.  At or around this time, Ms. Olsen called Nelnet's customer service line to inquire as to the status of her application, and was advised by a Nelnet representative to place her account into forbearance status until her application was approved. Because she could not afford monthly payments of $968.10, Ms. Olsen had no choice but to place her loans into forbearance status to avoid a delinquency.  The forbearance period covered the months of March, April, and May, during which period she should have been making affordable monthly payments that would count toward loan forgiveness.

42.     At the conclusion of Ms. Olsen's forbearance, an additional $1,061.90 in accrued interest added to her principal loan balance.

43.     By failing to promptly process Miss Ballard's IDR renewal application, Defendants violated 34 C.F.R. §685.221(e)(8)(i), which requires that IDR renewal requests by processed "promptly."

44. Because Nelnet's servicing contract with the Department of Education requires compliance with all applicable federal regulations, the aforementioned violations constitute a breach of the servicing contract, of which Ms. Ballard was an intended third-party beneficiary.

45.     Because Ms. Olsen's promissory note requires compliance with federal law, the

16

aforementioned conduct constitutes breach of, and/or intentional and tortious interference, with the federal government's performance of its contractual obligations.

## CLASS ACTION ALLEGATIONS

46.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of the following proposed Classes:

### NATIONWIDE FAILURE TO PROCESS CLASS

> All individuals with federal student loans serviced by Defendants who, at any time on or after a date four years prior to the filing of this action, 1) were enrolled in an IDR plan, and timely submitted a request to renew the plan, but nonetheless had their income-driven payments cancelled due to Defendants' processing delays, or 2) submitted a request for initial enrollment in an income-driven repayment plan that, due to Defendants' processing delays, was applied to the borrower's account more than 30 days after the date on which the request was received.

### OREGON FAILURE TO PROCESS CLASS

> All Oregon residents with federal student loans serviced by Defendants who, at any time on or after a date six years prior to the filing of this action, 1) were enrolled in an IDR plan, and timely submitted a request to renew the plan, but nonetheless had their income-driven payments cancelled due to Defendants' processing delays, or 2) submitted a request for initial enrollment in an income-driven repayment plan that, due to Defendants' processing delays, was applied to the borrower's account more than 30 days after the date on which the request was received.

46.    The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns. Also excluded from the Class is the Judge presiding over this action, his or her law clerks, spouse, any other person within the third degree of relationship living in the Judge's household, the spouse of such person, and the United States Government.

17

47. The Classes are composed of tens to hundreds of thousands (if not millions) of individuals and thus are so numerous that joinder of all members is impracticable.

48. The Classes can be readily ascertained through the records maintained by Defendants.

49. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

50. Plaintiff's claims are typical of the claims of members of the Classes.

51. As alleged herein, Plaintiff and members of the Classes sustained damages arising out of Defendants' common course of unlawful conduct. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein, and occurred in, and was directed from, this District.

52. There are questions of law and fact common to the Classes, the answers to which will advance the resolution of the claims of all class members.

53. These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual class members, including, without limitation:

a. Whether the Defendants have a common and pervasive practice of misprocessing and delaying applications for IDR plans;

b. Whether the misconduct of Defendants caused injuries to Plaintiffs and the Class by causing them to pay unnecessary interest, fees, and other charges;

c. Whether the misconduct of Defendants violates state consumer protection statutes;

d. Whether the misconduct of Defendants violates the common law;

18

e.      Whether the misconduct of Defendants constitutes a breach of the servicing contract;

f.      Whether the misconduct of Defendants constitutes a breach of, and/or tortious interference with, the promissory notes held by federal student loan borrowers.

54.    Plaintiffs will fairly and adequately represent and protect the interests of members of the Classes. Plaintiffs have no claims antagonistic to those of members of the Classes. Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of members of the Classes.

55.    Class action status is also warranted under Rule 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

56.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

19

## <u>COUNT I – BREACH OF CONTRACT</u>

**(Nationwide Class Against Defendants for Breach of Servicing Contract)**

57.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

58.    Plaintiff brings this Count on behalf of members of the Nationwide Class.

59.    For purposes of this Count, any reference to "Defendants" includes all named Defendants.

60.    At all relevant times, Plaintiff and members of the Nationwide Class were intended third-party beneficiaries of the servicing contract entered into between Defendants and the Department of Education.

61.    Pursuant to the terms of the servicing contract, Defendants agreed to comply with all applicable federal statutes and regulations.

62.    Under federal law, if a loan servicer receives a borrower's recertification materials prior to the annual renewal deadline, the loan servicer is prohibited from billing the borrower under the standard ten-year plan while it processes those materials. Rather, the servicer must maintain the borrower's current scheduled monthly payment amount until the loan holder determines the new monthly payment amount.

63.    Plaintiff timely submitted her recertification materials, but her income-driven payment amount was nonetheless cancelled due to unreasonable processing delays that were the fault of Defendants. When this occurred, Defendants increased Plaintiff's monthly payment amount significantly, and capitalized the accrued interest, in violation of federal law.

64.    Defendants failed to promptly process Plaintiff's IDR application in violation of federal law.

20

65.   Because the servicing contract requires compliance with all applicable federal regulations, the aforementioned violations also constitute a breach of the servicing contract.

66.   Because Plaintiff was an intended third-party beneficiary of the servicing contract, Defendants are liable to Plaintiff for its breaches thereof.

67.   As a result of Defendants' breaches of the express terms of the servicing contract, Plaintiff and members of the Nationwide Class have suffered the same sizeable damages, including, but not limited to (i) the difference in the amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with delayed progress towards certain loan forgiveness programs.

68.   Alternatively, even if it is determined that the above misconduct did not constitute a breach of the express terms of the servicing contract, it nonetheless constituted a breach of the covenant of good faith and fair dealing implied in the servicing contract.  And, as a result of this breach, Plaintiff and members of the Nationwide Class have suffered the same sizeable damages, including, but not limited to, (i) the difference in the amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with delayed progress towards certain loan forgiveness programs.

## COUNT II – BREACH OF CONTRACT

**(Nationwide Class against Defendants for
Breach of, and/or interference with, the Promissory Note)**

69.     Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

70.     Plaintiff brings this Count on behalf of members of the Nationwide Class.

71.     For purposes of this Count, any reference to "Defendants" includes all named Defendants.

72.     At all relevant times, Plaintiff and members of the Nationwide Class were in a contractual relationship with the federal Department of Education by virtue of their legally binding promissory notes.

73.     The terms of the promissory notes are binding on Defendants pursuant to Mirandette v. Nelnet, Inc., 2018 WL 459714.

74.     The promissory notes are governed by applicable federal law.  Under federal law, if a loan servicer receives a borrower's recertification materials prior to the specified annual deadline, the loan servicer is prohibited from switching the borrower to the standard repayment plan while it processes those materials.  Rather, the servicer must maintain the borrower's scheduled monthly payment amount until the new monthly payment amount is determined.

75.     Plaintiff made a timely submission of her recertification materials, but her income-driven repayment amount was nonetheless canceled due to Defendants' unreasonable processing delay.  When this occurred, Defendants billed Plaintiff under the standard ten-year repayment plan, which imposed significantly higher monthly payments, and triggered a costly interest capitalization.

22

76.     Defendants breached Plaintiff's promissory note by 1) failing to promptly renew her IDR plans, 2) billing her according to the standard repayment plan, despite her timely renewal of the IBR plan, and 3) applying a forbearance to her account to accommodate Defendants' own processing delay.

77.     Even if the promissory notes were not binding on Defendants, Defendants intentionally, tortiously and improperly interfered with the federal government's performance of the promissory notes.

78.     As a result of Defendants' breach of, and/or tortious interference with, Plaintiff's contracts with the federal government, Plaintiffs and members of the Nationwide Class have suffered the same sizeable damages, including, but not limited to (i) the difference in amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with delayed progress towards certain loan forgiveness programs.

79.     Alternatively, even if it is determined that the above misconduct did not constitute breach of, and/or tortious interference with, the express terms of the promissory note, it nonetheless constituted breach of, and/or tortious interference with, the covenant of good faith and fair dealing implied therein.  And, as a result, Plaintiff and members of the Nationwide Class have suffered the same sizeable damages, including, but not limited to (i) the difference in the amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with delayed progress towards certain loan forgiveness programs.

**COUNT III - VIOLATIONS OF THE NEBRASKA
UNIFORM DECEPTIVE TRADE PRACTICES ACT
(Neb. Rev. Stat. §§59-1601 to 59-1623)**

**(Plaintiff and Nationwide Class Against Defendants)**

47.     Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

48.     Plaintiff brings this Count on behalf of members of the Nationwide Class.

49.     Defendants are "persons" within the meaning of Neb. Rev. Stat. §59-1601.

50.     Neb. Rev. Stat. §59-1602 makes unlawful any unfair or deceptive acts or practices in the conduct of any trade or commerce.

51.     At all times relevant hereto, Defendants falsely represented that their loan servicing operations were in compliance with federal regulations.  For instance, Nelnet Inc.'s 2016 10-K filing with the Securities and Exchange Commission, available at https://s21.q4cdn.com/368920761/files/doc_financials/annual/2016/2016_Annual_Report.pdf (last visited May 8, 2018), states that Nelnet "has designed its servicing operations to comply with the Higher Education Act, and it regularly monitors the Company's operations to maintain compliance."  The filing also states that Nelnet has "procedures and controls in place to monitor compliance with numerous federal and state laws and regulations."  *See id.*

52.     Defendants, through their telephone customer service representatives, have routinely and falsely represented to borrowers that their loan accounts should be placed into forbearance status in order to accommodate Defendants' delays in processing IDR plan applications when, in fact, forbearances are not authorized under federal law for this purpose.

53.     Defendants violated the Nebraska Consumer Protection Act by falsely representing that the following actions were consistent with federal law:

24

       a.       cancelling Plaintiff's income-driven payment amount because of Defendants' processing delays, despite the fact that Plaintiff's recertification materials were electronically submitted on or before the annual renewal deadline;

       b.       capitalizing the accrued interest on Plaintiff's loans despite the fact that Plaintiff timely renewed her IDR plan;

       c.       failing to fully implement the renewal of Plaintiff's IDR plan for several months after Defendants received her renewal request despite their statutory obligation to do so; and

       d.       placing Plaintiff's loans into forbearance status to accommodate Defendants' processing delays.

104.   As a result of Defendants' violations of the Nebraska Consumer Protection Act, Plaintiff and members of the Nationwide Class have suffered the same sizeable damages, including, but not limited to (i) the difference in amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans during the first three years of enrollment in an IDR plan; and (iv) the financial harm associated with delayed progress towards certain loan forgiveness programs.

105.   Plaintiff and members of the Nationwide Class seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practice, declaratory relief, attorney's fees, and any other just and proper relief available under the Act.

**COUNT IV - VIOLATIONS OF THE NEBRASKA**
**UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**Neb. Rev. Stat. §§87-301 to 87-306**

**(Plaintiff and Nationwide Class Against Defendants)**

106.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

107.    Plaintiff brings this Count on behalf of members of the Nationwide Class.

108.    Defendants are persons within the meaning of the Uniform Deceptive Trade Practices Act.

109.    The Uniform Deceptive Trade Practices Act makes it unlawful to represent that goods or services have a sponsorship or approval that they do not have.

110.    At all times relevant hereto, Defendants falsely represented that their loan servicing operations had the sponsorship and approval of the federal government.  For instance, Nelnet Inc.'s 2016 10-K filing with the Securities and Exchange Commission, available at https://s21.q4cdn.com/368920761/files/doc_financials/annual/2016/2016_Annual_Report.pdf (last visited May 8, 2018), states that Nelnet "has designed its servicing operations to comply with the Higher Education Act, and it regularly monitors the Company's operations to maintain compliance."  The filing also states that Nelnet has "procedures and controls in place to monitor compliance with numerous federal and state laws and regulations."  *See id.*

111.    Defendants, through their telephone customer service representatives, have routinely and falsely represented to borrowers that their loan accounts should be placed into forbearance status in order to accommodate Defendants' delays in processing IDR plan applications when, in fact, forbearances are not authorized under federal law for this purpose.

112.    Defendants violated the Uniform Deceptive Trade Practices Act by falsely

representing that the following actions had the approval or sponsorship of the federal government:

      a.     cancelling Plaintiff's income-driven payment amount because of Defendants' processing delays, despite the fact that Plaintiff's recertification materials were electronically submitted on or before the annual renewal deadline;

      b.     capitalizing the accrued interest on Plaintiff's loans despite the fact that Plaintiff timely renewed her IDR plan;

      c.     failing to fully implement the renewal of Plaintiff's IDR plan for several months after Defendants received her renewal request despite their statutory obligation to do so; and

      d.     placing Plaintiff's loans into forbearance status to accommodate Defendants' processing delays.

113.    The Uniform Deceptive Trade Practices Act makes it unlawful to use any scheme or device to defraud by means of obtaining money or property by knowingly false or fraudulent pretenses.

114.    Nelnet obtained additional monthly servicing fees from the federal government through its scheme of delaying or failing to process borrowers IDR applications under the false pretense that said actions were complaint with federal law.

115.    As a result of Defendants' violations, Plaintiff and members of the Nationwide Class have suffered the same sizeable damages, including, but not limited to (i) the difference in amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest

subsidy offered by the federal government for those with subsidized loans during the first three years of enrollment in an IDR plan; and (iv) the financial harm associated with delayed progress towards certain loan forgiveness programs.

116.    Plaintiff and members of the Nationwide Class seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practice, declaratory relief, attorney's fees, and any other just and proper relief available under the Act.

## COUNT V - VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
### Oregon Revised Statutes §§646.605-646.656

### (Plaintiff and Oregon Class Against Defendants)

117.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

118.    Plaintiff brings this Count on behalf of members of the Oregon Class.

119.    Defendants are persons within the meaning of the Unlawful Trade Practices Act.

120.    The Unlawful Trade Practices Act makes it unlawful to cause confusion or misunderstanding relating to the approval of a particular good or service.

121.    At all times relevant hereto, Defendants falsely represented that their loan servicing operations had the approval of the federal government.  For instance, Nelnet Inc.'s 2016 10-K filing with the Securities and Exchange Commission, available at https://s21.q4cdn.com/368920761/files/doc_financials/annual/2016/2016_Annual_Report.pdf (last visited May 8, 2018), states that Nelnet "has designed its servicing operations to comply with the Higher Education Act, and it regularly monitors the Company's operations to maintain compliance."  The filing also states that Nelnet has "procedures and controls in place to monitor compliance with numerous federal and state laws and regulations."  *See id.*

28

122.    Defendants, through their telephone customer service representatives, have routinely and falsely represented to borrowers that their loan accounts should be placed into forbearance status in order to accommodate Defendants' delays in processing IDR plan applications when, in fact, forbearances are not authorized under federal law for this purpose.

123.    Defendants violated the Unlawful Trade Practices Act by falsely representing that the following actions had the approval of the federal government:

    a.    cancelling Plaintiff's income-driven payment amount because of Defendants' processing delays, despite the fact that Plaintiff's recertification materials were electronically submitted on or before the annual renewal deadline;

    b.    capitalizing the accrued interest on Plaintiff's loans despite the fact that Plaintiff timely renewed her IDR plan;

    c.    failing to fully implement the renewal of Plaintiff's IDR plan for several months after Defendants received her renewal request despite their statutory obligation to do so; and

    d.    placing Plaintiff's loans into forbearance status to accommodate Defendants' processing delays.

124.    As a result of Defendants' violations of the Act, Plaintiff and members of the Oregon Class have suffered the same sizeable damages, including, but not limited to (i) the difference in amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans during the first three years of enrollment in an IDR plan; and (iv) the financial harm associated with delayed progress

towards certain loan forgiveness programs.

125.    Plaintiff and members of the Oregon Class seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practice, declaratory relief, attorney's fees, and any other just and proper relief available under the Act.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that this Court enter judgment against Defendants and in favor of Plaintiff:

A.    Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as representative of the Classes and Plaintiff's counsel as counsel for the Classes;

B.    Declaring, adjudging, and decreeing the conduct alleged herein as unlawful;

C.    Enjoining Defendants from continuing to commit the above-cited violations of law;

D.    Awarding compensatory and punitive damages along with pre- and post-judgment interest;

E.    Granting Plaintiff the costs of suit, including reasonable attorneys' fees and expenses; and;

F.    Affording Plaintiff with such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND; TRIAL LOCATION

Plaintiff hereby demands a trial by jury and designates Lincoln, Nebraska as the location for trial.

Domina Law Group pc llo

s/ *David A. Domina*
Bar Number: #11043 Neb
Attorney for Plaintiff and the Classes
Domina Law Group pc llo
2425 S. 144th St. Omaha, NE 68144
Telehone: (402)-493-4100
Fax: (402)-493-9782
E-mail: DAD@dominalaw.com

Admission pro hac vice to be requested:

EDELMAN, COMBS, LATTURNER, & GOODWIN, LLC

s/ *Daniel A. Edelman*
Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Frances R. Green
Cassandra P. Miller
Illinois ARDC Number: 00712094
Attorneys for Plaintiff and the Classes

EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, Illinois 60603
Telephone: (312) 739-4200
Fax: (312) 419-0379 (FAX)
Email: dedelman@edcombs.com

FIORENTINO LAW OFFICES, LTD.

s/ *Anthony Fiorentino*
Illinois ARDC Number: 6316521
Attorney for Plaintiff and the Classes
FIORENTINO LAW OFFICES LTD.
180 N. LaSalle Street, Suite 2440
Chicago, Illinois 60602
Telephone: (312)-853-0050
Fax: 312-853-3254
Email: anthony@fiorentinolaw.com