**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| JESSICA OLSEN, on behalf of herself and other similarly situated individuals, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 4:18-cv-03081-JMG-MDN |
| NELNET, INC., a Nebraska corporation, NELNET DIVERSIFIED SOLUTIONS, LLC, a Nebraska limited liability company, and NELNET SERVICING, LLC, a Nebraska limited liability company, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**<u>BRIEF IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................... 1

II.  STANDARD OF REVIEW .......................................................................... 3

III.  ARGUMENT ............................................................................................... 4

    1.  **Count I Should Be Dismissed as to all Defendants.** ......................... 4

        a.  *Olsen Is Not an Intended Third-Party Beneficiary of Nelnet Servicing, LLC's Servicing Agreement with the United States Department of Education and, Consequently, She Lacks the Ability to Enforce Its Terms.* ........................................................... 4

        b.  *Irrespective of Whether Olsen Qualifies as an Intended Third-Party Beneficiary, Count I Constitutes an Impermissible Attempt to End-Run around the Higher Education Act's Enforcement Regime.* ........................................................................................... 7

    2.  **Count II Should Be Dismissed as to All Defendants.** ....................... 10

        a.  *No Contractual Relationship Exists between Defendants and Olsen.* ............................................................................................ 10

        b.  *Irrespective of Whether Defendants Were in Privity of Contract with Olsen, Count II Also Constitutes an Impermissible Attempt to End-Run around the Higher Education Act's Enforcement Regime.* ......................................................................................... 12

        c.  *Moreover, Even If Olsen's End-Run Scheme Were Theoretically Viable, the Regulatory Provision(s) Defendants Allegedly Violated Came into Effect After Olsen Executed the Promissory Note.* ............................................................................................. 13

        d.  *Olsen's Alternative Theory that Defendants Have Committed Tortious Interference Fails Because Tortious Interference Sounds In Tort, and Olsen Has Not Properly Pleaded Such a Tort Claim.* ................................................................................... 14

        e.  *Olsen's Alternative Theory that Defendants Have Committed Tortious Interference Also Fails Because Defendants Service Olsen's Loan on Behalf of the Department and, as Such, Are Legally Incapable of Tortiously Interfering with the Promissory Note.* ............................................................................................. 15

    3.  **Counts III through V of the Complaint Should Be Dismissed as to all Defendants Because the Complaint Fails to Sufficiently Plead Facts in Support of Olsen's Claims that Defendants Violated the Underlying State Statutes.** ............................................ 17

    4.  **Counts III through V of the Complaint Should Be Dismissed Because they Are Expressly Preempted by the Higher Education Act.** .......................................................................................... 20

i

**5.** **Count III, which Arises under the Nebraska Consumer Protection Act, Should Be Dismissed as to all Defendants Because NEB. REV. STAT. § 59-1617(1) Exempts the Entire Spectrum of Defendants' Purportedly Deceptive and/or Unfair Conduct from the Nebraska Consumer Protection Act.** .............................. 23

    *a.* *The United States Department of Education and the Consumer Financial Protection Bureau, Among Others, Directly and Pervasively Regulate Student Loan Servicing Practices, Including the Processing of Forbearances and IBR Plan Applications.*.................................................................................... 25

    *b.* *The Securities and Exchange Commission Directly Regulates Nelnet, Inc.'s Investor Communications, Including the Statements in Its Annual 10-Ks.*.................................................. 28

**6.** **Count IV, which Arises under the Nebraska Uniform Deceptive Trade Practices Act, Should Be Dismissed as to all Defendants Because it Suffers from Additional Incurable Defects.** ................................. 30

    *a.* *Olsen Never Purchased Goods or Services from Defendants, as Required by the Nebraska Uniform Deceptive Trade Practices Act.*.......................................................................................... 30

    *b.* *Olsen's Nebraska Uniform Deceptive Trade Practices Act Claim Is Also Barred by the Applicable Statute of Limitations.* ................................ 32

    *c.* *Olsen Lacks Standing to Enforce the Nebraska Uniform Deceptive Trade Practices Act Because She Is Not a "Person Likely to Be Damaged" in the Future by Defendants' Allegedly Deceptive Practices and Thus Cannot Assert a Viable Claim for Injunctive Relief.*............................................................................. 33

**7.** **Count V, which Arises under the Oregon Unfair Trade Practices Act, Should Be Dismissed as to all Defendants Because it Is Barred by the Applicable Statute of Limitations.** ................... 35

**IV. CONCLUSION**...................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                  **<u>Page(s)</u>**

*AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, 726 F. Supp. 2d 307 (S.D.N.Y. 2010) ........................................................................ 14-15

*Anderson v. Wells Fargo Home Mortg.*, No. 14-5013 ADM/JSM, 2016 U.S. Dist. LEXIS 23899 (D. Minn. Feb. 25, 2016) ...................................... 13

*Arizona v. United States*, 132 S. Ct. 2492 (2012)............................................ 20

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. ___, 135 S. Ct. 1378 (2015) .............................................................................................. 5

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009)................................... 3

*Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011)............................ 5, 8, 9, 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007) ................... 3

*Bottoni v. Sallie Mae, Inc.*, No. C 10-03602 LB, 2011 US Dist. LEXIS 61626 (N.D. Cal. June 6, 2011) ......................................................... 31

*Bradbury v. Network Enters.*, No. 4:12-CV-575 (CEJ), 2013 U.S. Dist. LEXIS 19308 (E.D. Mo. Feb. 13, 2013) ................................................ 16

*Braddock v. Primus Grp., Inc.*, No. 8:13cv258, 2014 U.S. Dist. LEXIS 109284 (D. Neb. Feb. 5, 2014)............................................................. 5

*Brown v. Grandmother's, Inc.*, No. 4:09CV3088, 2010 U.S. Dist. LEXIS 13625 (D. Neb. Feb. 16, 2010)........................................................... 34

*Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010).................................... 22, 23

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992).................................... 23

*College Loan Corp. v. SLM Corp.*, 396 F.3d 588 (4th Cir. 2005)....................... 7

*Conder v. Home Sav. of Am.*, 680 F. Supp. 2d 1168 (C.D. Cal. 2010) ............... 10-11

*Craw v. City of Lincoln*, 24 Neb. App. 788 (2017) ......................................... 14

*D & S Realty, Inc. v. Cutler*, No. A-09-036, 2003 Neb. App. LEXIS 5 (Ct. App. Jan. 14, 2003) ........................................................................ 14

*Davis v. Navient Corp.*, No. 17-CV-00992-LJV-JJM, 2018 U.S. Dist. LEXIS 41365 (W.D.N.Y. Mar. 12, 2018) ....................................................... 11

*Deerman v. Fed. Home Loan Mortg. Corp.*, 955 F. Supp. 1393 (N.D. Ala. 1997)............................................................................. 31

*Dominium III. Three v. Arbor Dev. Group, Inc.*, No. A-00-1051, 2002 Neb. App. LEXIS (Ct. App. Sep. 17, 2002) .............................................. 12

*Dowers v. Nationstar Mortg., LLC*, 852 F.3d 964 (9th Cir. 2017) ................... 31

*Drobnak v. Andersen Corp.*, 561 F.3d 778 (8th Cir. 2009) ............................. 19

**Cases, continued**                                                    **Page(s)**

*Erickson v. Hill*, No. A-15-1102, 2017 Neb. App. LEXIS 12 (Ct. App. Jan. 24, 2017)................................................................................ 4

*Fastrich v. Cont'l Gen. Ins. Co.*, No. 8:16CV487, 2017 U.S. Dist. LEXIS 132947 (D. Neb. Aug. 21, 2017)................................................ 16

*Fogelbach v. Wal-Mart Stores, Inc.*, 270 F.3d 696 (8th Cir. 2001) ................... 4

*Garcia v. Nelnet, Inc.*, No. 13-21600-CIV-LENARD/GOODMAN, 2014 U.S. Dist. LEXIS 192699 (S.D. Fla. Apr. 17, 2014) ...................................... 2

*Gaston v. Parsons*, 318 Or. 247, 864 P.2d 1319 (1994) ............................... 35

*Hanson v. Amerihome Mortg. Co., LLC*, No. 2:17-cv-03691, 2017 U.S. Dist. LEXIS 212383 (S.D. W. Va. Dec. 28, 2017)................................. 11

*Hawkins Constr. Co. v. Peterson Contrs., Inc.*, 970 F. Supp. 2d 945 (D. Neb. 2013) ................................................................... 4, 10

*Hecker v. Ravenna Bank*, 238 Neb. 810, 468 N.W.2d 88 (1991) .................. 11

*Hrock v. Farmland Indus.*, 4 Neb. App. 709, 548 N.W.2d 367 (1996) ........... 15

*Huff v. Swartz*, 258 Neb. 820, 606 N.W.2d 461 (2000) ......................... 12, 15

*Humphrey v. Citibank, N.A.*, No. 2:12-CV-00148-MPM-JMV, 2013 U.S. Dist. LEXIS 137465 (N.D. Miss. July 2, 2013) ..................................... 31

*Hydroflo Corp. v. First Nat'l Bank*, 217 Neb. 20, 349 N.W.2d 615 (1984)...................... 24

*Ibreheme v. Capital One, N.A.*, 933 F. Supp. 2d 86 (D.D.C. 2013) ............... 30

*In re ConAgra Foods, Inc.*, 908 F. Supp. 2d 1090 (C.D. Cal. 2012) ............... 24

*Kartiganer Assoc. v. Town of New Windsor*, 108 A.D.2d 898, 485 N.Y.S.2d 782 (1985) ..................................................... 15

*Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013) ............................. 20

*Kuntzelman v. Avco Financial Services of Nebraska, Inc.*, 206 Neb. 130, 291 N.W.2d 705 (1980) ................................................. 24

*L'ggrke v. Benkuls*, 966 F.2d 1346 (10th Cir. 1992) ............................... 7

*Labickas v. Ark. State Univ.*, 78 F.3d 333 (8th Cir. 1996)........................ 2, 7

*Linsley v. FMS Inv. Corp.*, No. 3:11cv961(VLB), 2012 U.S. Dist. LEXIS 53735 (D. Conn. Apr. 17, 2012)........................................... 23

*Little v. Gillette*, 218 Neb. 271, 354 N.W.2d 147 (1984) ........................ 24

*Marten v. Staab*, 249 Neb. 299, 543 N.W.2d 436 (1996) ......................... 4

*Mazzei v. Money Store*, 308 F.R.D. 92 (S.D.N.Y. May 29, 2015)................. 10

*McCaul v. American Savings Co.*, 213 Neb. 841, 331 N.W.2d 795 (1983) ......... 24

*McCulloch v. PNC Bank Inc.*, 298 F.3d 1217 (11th Cir. 2002) ................... 2, 7

## Cases, continued                                                      Page(s)

*McInroy v. BAC Home Loan Servicing, LP*, No. 10-4342 (DSD/SER), 2011
U.S. Dist. LEXIS 49868 (D. Minn. May 9, 2011) ................................................ 5, 9

*Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717 (5th Cir. 2013) .................... 31

*Mirandette v. Nelnet, Inc.*, No. 1:16-CV-50, 2016 U.S. Dist. LEXIS 106066
(W.D. Mich. Aug. 11, 2016) ................................................................................ 32

*Mirandette v. Nelnet, Inc.*, 720 Fed. Appx. 288
(6th Cir. 2018)..........................................................11, 12, 24, 27, 30, 31, 32

*Moreno v. Bank of Am., N.A.*, No. 3:11-cv-1265-HZ, 2012 U.S. Dist. LEXIS
59256 (D. Or. Apr. 27, 2012) ............................................................................. 35

*Neb. Beef v. Universal Sur. Co.*, 9 Neb. App. 40 (2000) ............................................ 6

*Nelson v. Great Lakes Educ. Loan Servs.*, No. 3:17-CV-00183-NJR-SCW,
2017 U.S. Dist. LEXIS 208331 (S.D. Ill. Dec. 19, 2017) ........................ 21, 22, 23

*Nelson v. Lusterstone Surfacing Co.*, 258 Neb. 678,
605 N.W.2d 136 (2000) ..................................................................................... 18

*Parker v. BAC Home Loans Servicing LP*, 831 F. Supp. 2d 88
(D.D.C. 2011) ................................................................................................... 16

*Parks Sch. of Bus. v. Symington*, 51 F.3d 1480 (9th Cir. 1995) ................................ 7

*Podraza v. New Century Physicians of Nebraska, LLC*, 280 Neb. 678,
789 N.W.2d 260 (2010) ....................................................................................... 5

*Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*, No. 04 Civ. 704
(RPP), 2005 U.S. Dist. LEXIS 9772 (S.D.N.Y. May 20, 2005).............................. 9

*Reinbrecht v. Walgreen Co.*, 16 Neb. App. 108, 742 N.W.2d 243 (2007) .................... 33

*Rojas v. Wells Fargo Bank, N.A.*, 571 Fed. Appx. 274 (5th Cir. 2014) ........................ 31

*Ruiz v. Hammer & Nails, LLC*, No. 2:10-CV-1021-SU, 2013 U.S. Dist.
LEXIS 138956 (D. Or. Sep. 27, 2013) ............................................................... 35

*S.S. v. Bellevue Med. Ctr. L.L.C.*, No. 8:13CV143, 2015 U.S. Dist. LEXIS
68387 (D. Neb. May 27, 2015) ............................................................................ 4

*Saint Mary of the Plains College v. Higher Educ. Loan Program, Inc.*,
724 F. Supp. 803 (D. Kan. 1989)......................................................................... 7

*Salem Grain Co. v. Consol. Grain & Barge Co.*, 297 Neb. 682,
900 N.W.2d 909 (2017) ..................................................................................... 18

*Savorelli v. Stone*, 168 Neb. 419, 96 N.W.2d 222 (1959)............................................ 11

*Scherr v. Rhodes*, 416 U.S. 232, 94 S. Ct. 1683 (1974)................................................ 3

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393
(2010) ................................................................................................................ 4

**Cases, continued**                         **Page(s)**

*Shank v. City of Kimball*, No. 7:08CV5004, 2009 U.S. Dist. LEXIS 4085 (D. Neb. Jan. 9, 2009) .................................................................. 15

*Shelton v. Young's Welding & Mach. Shop, LLC*, No. 8:14CV165, 2015 U.S. Dist. LEXIS 7172 (D. Neb. Jan. 20, 2015) ...................................... 6

*State Board of Educational Lands & Funds v. Haberman*, 191 Neb. 127, 214 N.W.2d 266 (1974) ....................................................... 13

*Sydow v. City of Grand Island*, 263 Neb. 389, 639 N.W.2d 913 (2002).......................... 4

*Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 820 F. Supp. 2d 953 (N.D. Iowa 2011) ........................................................... 9

*Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 773 F.3d 58 (8th Cir. 2014)...................... 9

*Ugonwa Azike v. E-Loan, Inc.*, No. 8:09CV37, 2009 U.S. Dist. LEXIS 49666 (D. Neb. June 11, 2009) ............................................. 33

*Watkins Concrete Block Co. v. Pacha Watkins Concrete Block Co.*, No. A-09-800, 2010 Neb. App. LEXIS 112 (Ct. App. July 13, 2010) ............................. 5

*Wells Fargo Bank, N.A. v. Ash Org.*, No. 09-CV-188-MO, 2010 U.S. Dist. LEXIS 66542 (D. Or. July 1, 2010) ....................................... 16

*Wolfbauer v. Ocwen Loan Servicing, LLC*, No. 4:15CV3141, 2016 U.S. Dist. LEXIS 38541 (D. Neb. Mar. 24, 2016)................................ 33, 34

*York v. Wellmark, Inc.*, No. 4:16-cv-00627-RGE-CFB, 2017 U.S. Dist. LEXIS 199888 (S.D. Iowa Sep. 6, 2017) ............................... 9

*Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006 (S.D. Iowa 2009) ......................... 30

**Constitutional Provisions**

U.S. CONST. art. VI, cl. 2................................................................ 20

**Statutes**

12 U.S.C. § 5514.......................................................................... 26

15 U.S.C. § 78m........................................................................... 29

20 U.S.C. § 1078-3(b)(1)(F) ........................................................... 21

20 U.S.C. § 1082(m)(1)(D)(i) .......................................................... 11

20 U.S.C. § 1083(e)(1) and (2)......................................................... 21

20 U.S.C. § 1087e........................................................................ 25

20 U.S.C. § 1087f(a)(2) ................................................................. 25

20 U.S.C. § 1098g........................................................... 20, 21, 22, 23

28 U.S.C. § 1332 (d)(2) ................................................................... 4

NEB. REV. STAT. Ch. 59................................................................. 18

**Statutes, continued**                                                      **Page(s)**

Neb. Rev. Stat. § 59-1602 ...................................................................... 18

Neb. Rev. Stat. § 59-1617 .............................................. 23, 24, 27, 28

Neb. Rev. Stat. § 87-302 .............................................. 17, 18, 19, 20

Neb. Rev. Stat. § 87-303 ................................................................ 33, 34

Neb. Rev. Stat. § 87-303.10 ........................................................ 30, 32

Or. Rev. Stat. § 646.608(1)(b)-(c) ................................................ 18

Or. Rev. Stat. § 646.638(6) ........................................................ 35, 36

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................... 3, 20

Fed. R. Civ. P. 9(b) ............................................................................. 19

Fed. R. Civ. P. 12(b)(1) ..................................................................... 34

Fed. R. Civ. P. 12(b)(6) ....................................................... 1, 3, 12, 34

**Regulations**

17 C.F.R. § 200.18(b) ........................................................................ 29

17 C.F.R. § 200.19b .......................................................................... 29

17 C.F.R. Part 229 ............................................................................ 29

34 C.F.R. § 674.31 ............................................................................ 21

34 C.F.R. § 674.42 ............................................................................ 21

34 C.F.R. § 682.205 .................................................................... 21, 25

34 C.F.R. § 682.700-12 ..................................................................... 25

34 C.F.R. § 685.208 .......................................................................... 25

34 C.F.R. § 685.209 .......................................................................... 25

34 C.F.R. § 685.221 .................................... 2, 10, 13, 14, 25, 27, 28

34 C.F.R. § 668.41(b) ........................................................................ 21

34 C.F.R. § 668.81-99 ....................................................................... 25

**Other Authorities**

9 J. Murray, Corbin on Contracts § 45.6, p. 92 (rev. ed. 2007) ....................................... 5

Office of Postsecondary Education, Department of Education; *Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 73 Fed. Reg. 63232, 63259 ................................................................. 13-14

## Other Authorities, continued

Office of Postsecondary Education, Department of Education; *Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 77 Fed. Reg. 66088, 66147 (Nov. 1, 2012) ............................................................................ 14

*AG Healey Sues to Protect Public Service Loan Forgiveness*, Mass.gov (Aug. 23, 2017) ................................................................................................... 26

*Annual Report of the CFPB Student Loan Ombudsmen*, ConsumerFinance.gov (October, 2017) .......................................................... 26

*CFPB Sues Nation's Largest Student Loan Company Navient for Failing Borrowers at Every Stage of Repayment*, ConsumerFinance.gov (Jan. 18, 2017) ................................................................................................. 26

Office of the Secretary, Department of Education; *Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers*, 83 Fed. Reg. 10619 (March 12, 2018) ............................................................................ 21, 25

Nelnet, Inc., 2016 10-K Annual Report (Feb. 27, 2017) .................................... 18, 29, 35

Restatement 2d of Contracts, § 313 cmt. a ................................................................... 6

Restatement 3d of Agency, § 6.01 ............................................................................... 11

Stacy Cowley, *California Will Be Fourth State to Sue Navient Over Student Loans*, New York Times (June 28, 2018) .............................................. 26

*What We Do*, SEC.gov .................................................................................................. 29

Defendants Nelnet, Inc. ("NNI"), Nelnet Diversified Solutions, LLC ("NDS"), and Nelnet Servicing, LLC ("NSL," and, collectively, the "Defendants"), through their undersigned counsel, respectfully submit this Brief in Support of their Joint Motion to Dismiss (the "Motion") Plaintiff Jessica Olsen's ("Olsen") Class Action Complaint (the "Complaint") pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## I.      INTRODUCTION

NNI is the parent entity to NDS and the grandparent entity to NSL.  NSL is a servicer of student loans that are owned and/or guaranteed by the United States Department of Education (the "Department").  Olsen's Complaint[1] accuses Defendants of "abusing" the student loan repayment process by "keeping loans active for as long as possible" in order to "generate additional monthly servicing fees" from the Department. (ECF No. 1, ¶ 5)  The Complaint alleges that Defendants carry out this scheme by, *inter alia*, improperly placing student loans into forbearance status, slowly processing income-driven repayment ("IDR")[2] plan applications, cancelling existing IDR plans, and capitalizing accrued student loan interest at the conclusion of borrowers' forbearance periods.  (ECF No. 1, ¶¶ 5-6)  Olsen attempts to support these assertions by citing to several industry reports published by the Consumer Financial Protection Bureau (the

---

[1] As a preliminary matter, Defendants note that Olsen's Complaint contains both duplicate and missing paragraph numbers.  For example, the Complaint contains two each of paragraphs 36 through 43 and 46 through 53, and skips over paragraphs 80 through 103.  Where applicable, Defendants will identify the specific paragraph of the Complaint they are citing (*e.g.*, "First ¶ 36" or "Second ¶ 53").  Also, Olsen's Complaint makes a stray reference to "Navient Corp."  (ECF No. 1, First ¶ 39)  As Navient Corp. has no ostensible involvement with this dispute, Defendants will treat Olsen's reference to Navient Corp. as unintentional.  Similarly, Olsen's Complaint makes two unexplained references to a "Ms. Ballard."  (*Id.*, Second ¶ 43, ¶ 44)  Again, Defendants consider Olsen's references to "Ms. Ballard" to be inadvertent.

[2] The Department offers, and NSL administers, IDR plans that adjust borrowers' monthly payment amounts according to their income and family size.

"CFPB"), along with unspecified findings Olsen claims have been "revealed through the independent investigation of Plaintiff's counsel."  (ECF No. 1, ¶¶ 8-12)

Despite the wide-reaching nature of Olsen's conclusions, the Complaint fails to adequately explain, with factual support, how Defendants have purportedly engaged in a "pervasive" pattern of "misconduct."  (ECF No. 1, ¶ 15)  Instead, the substance of the Complaint focuses entirely upon one solitary, standalone act that, even if proven, would amount to a relatively minor regulatory infraction.  Specifically, the Complaint alleges that, in February of 2015, Defendants miscalculated the date upon which Olsen submitted her IDR plan renewal application, which triggered a hypertechnical violation of 34 C.F.R. § 685.221(e)(8).

The allegedly offended regulation, § 685.221(e)(8), is one of many servicing regulations promulgated by the United States Secretary of Education pursuant to the Higher Education Act of 1965, as amended (the "HEA").  Critically, however, the HEA does not confer a private right of action upon student loan borrowers.  *Labickas v. Ark. State Univ.*, 78 F.3d 333, 334 (8th Cir. 1996) ("We conclude that no private right of action is implied under the HEA for student borrowers."); *Garcia v. Nelnet, Inc.*, No. 13-21600-CIV-LENARD/GOODMAN, 2014 U.S. Dist. LEXIS 192699, at *6-7 (S.D. Fla. Apr. 17, 2014) ("[N]early every court to consider the issue in the last twenty-five years has determined that there is no express or implied private right of action to enforce any of the HEA's provisions.") (quoting *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1224-25 (11th Cir. 2002)).  In a strained effort to circumvent the HEA's enforcement regime, Olsen attempts to recast what is, at bottom, a regulatory dispute into a handful of nominally different legal causes of action.  In particular, the Complaint asserts the

2

following: (1) that Defendants breached NSL's servicing contract with the Department (the "Servicing Agreement"); (2) that Defendants breached the promissory note that governs Olsen's Federal Direct Consolidation Loan (the "Promissory Note"); (3) that Defendants tortiously interfered with the Promissory Note; (4) that Defendants violated the Nebraska Consumer Protection Act (the "NCPA"); (5) that Defendants violated the Nebraska Uniform Deceptive Trade Practices Act (the "NUDTPA"); and (6) that Defendants violated the Oregon Unfair Trade Practices Act (the "OUTPA"). Furthermore, Olsen purports to assert all claims other than the OUTPA claim on behalf of a nationwide class, and she purports to assert the OUTPA claim on behalf of an Oregon-specific class.  (ECF No. 1, First ¶ 46)  For the reasons discussed below, each claim fails.

## II.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint may be dismissed on account of its "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  When analyzing a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Court must rule "on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007) (quoting *Scherr v. Rhodes*, 416 U.S. 232, 94 S. Ct. 1683 (1974)).  To withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff "must plead sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009)).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

3

### III.   ARGUMENT

**1.   Count I Should Be Dismissed as to all Defendants.**

> *a.   Olsen Is Not an Intended Third-Party Beneficiary of Nelnet Servicing, LLC's Servicing Agreement with the United States Department of Education and, Consequently, She Lacks the Ability to Enforce Its Terms.*

In order to state a claim for breach of contract under Nebraska law,[3] a plaintiff must allege the following elements: (1) the existence of a definite and certain promise owed by the defendant to the plaintiff; (2) a breach of that promise; (3) damages arising from the defendant's breach; and (4) the plaintiff's compliance with all conditions precedent giving rise to the defendant's duty. *Erickson v. Hill*, No. A-15-1102, 2017 Neb. App. LEXIS 12, at *5 (Ct. App. Jan. 24, 2017) (citing *Sydow v. City of Grand Island*, 263 Neb. 389, 639 N.W.2d 913 (2002)).   Thus, contractual liability only arises between, and contractual duties can only be enforced by, contracting parties themselves.   See *Hawkins Constr. Co. v. Peterson Contrs., Inc.*, 970 F. Supp. 2d 945, 952 (D. Neb. 2013) ("Privity is a requirement under Nebraska state law.").   This general rule is subject to certain exceptions, such as when the person seeking to enforce a contract "qualifies as a third-party beneficiary thereof."   *Marten v. Staab*, 249 Neb. 299, 304, 543 N.W.2d 436, 442 (1996).

In order to qualify as a third-party beneficiary, "it must appear by express stipulation or by reasonable intendment that the rights and interests of such unnamed

---

[3]  According to the Complaint, the Court has jurisdiction over all of Olsen's claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).   (ECF No. 1, ¶ 16)   Accepting that as true, a "United States District Court sitting in diversity jurisdiction applies the substantive law of the forum state."   *S.S. v. Bellevue Med. Ctr. L.L.C.*, No. 8:13CV143, 2015 U.S. Dist. LEXIS 68387, at *5 (D. Neb. May 27, 2015) (quoting *Fogelbach v. Wal-Mart Stores, Inc.*, 270 F.3d 696, 698 (8th Cir. 2001)); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010).   As no substantial conflict of law exists between Nebraska law and Oregon law with respect to issues addressed herein, Nebraska law governs Counts I and II.

parties were contemplated and that provision was being made for them." *Braddock v. Primus Grp., Inc.*, No. 8:13cv258, 2014 U.S. Dist. LEXIS 109284, at *23 (D. Neb. Feb. 5, 2014) (quoting *Podraza v. New Century Physicians of Nebraska, LLC*, 280 Neb. 678, 789 N.W.2d 260 (2010)).   In other words, "[a] plaintiff's right to sue as a third-party beneficiary must affirmatively appear from the language of the instrument when properly interpreted or construed." *Id.* (quoting *Podraza*, 280 Neb. at 789) (internal quotation marks omitted); see also *Watkins Concrete Block Co. v. Pacha Watkins Concrete Block Co.*, No. A-09-800, 2010 Neb. App. LEXIS 112, at *9 (Ct. App. July 13, 2010) ("The test is whether the parties to the contract intended to confer a benefit directly upon the third party or whether the benefit to the third party was merely incidental.").

Furthermore, the law imposes a particularly rigorous standard upon plaintiffs attempting to invoke third-party beneficiary status with respect to government contracts. See *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. ___, 135 S. Ct. 1378, 1387 (2015) ("[T]he modern jurisprudence permitting intended beneficiaries to sue does not generally apply to contracts between a private party and the government."); *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 118 (2011) ("The distinction between an intention to benefit a third party and an intention that the third party should have the right to enforce that intention is emphasized where the promisee is a governmental entity.") (quoting 9 J. Murray, Corbin on Contracts § 45.6, p. 92 (rev. ed. 2007)); *McInroy v. BAC Home Loan Servicing, LP*, No. 10-4342 (DSD/SER), 2011 U.S. Dist. LEXIS 49868, at *6-7 (D. Minn. May 9, 2011) ("Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries

5

unless a different intention is manifested.") (quoting Restatement 2d of Contracts, § 313 cmt. a).

In Count I of the Complaint, Olsen concedes that she is not a party to the 2009 Servicing Agreement entered into between NSL and the Department,[4] and instead insists that "Defendants are liable to [her] for [their] breaches thereof" on the grounds that she is an intended third party beneficiary.  (ECF No. 1, ¶¶ 60, 66)  However, the Complaint does not allege that Defendants and the Department expressly stipulated to Olsen's proclaimed third-party beneficiary status, or that Defendants and the Department otherwise intended to confer third-party beneficiary status upon Olsen such that she may sue to enforce the Servicing Agreement.  Rather, the Complaint simply declares, in conclusory fashion, that Olsen somehow *is* an intended third-party beneficiary.  Without more, Count I fails to state a plausible claim upon which relief can be granted.  See *Neb. Beef v. Universal Sur. Co.*, 9 Neb. App. 40, 47 (2000) (affirming demurrer of breach of contract claim where plaintiff failed to allege sufficient facts to support an inference that it was an intended third-party beneficiary); *Shelton v. Young's Welding & Mach. Shop, LLC*, No. 8:14CV165, 2015 U.S. Dist. LEXIS 7172, at *13-14 (D. Neb. Jan. 20, 2015) (granting motion to dismiss breach of warranty claim where plaintiff "did not allege any facts supporting an inference that it was a third-party beneficiary to any sales contract").

---

[4]  Paragraph 23 of the Complaint states that the Servicing Agreement is attached as Exhibit A thereto.  In fact, Olsen's Complaint contains no exhibits or attachments.  Nevertheless, the Servicing Agreement is available online at https://www2.ed.gov/policy/gen/leg/foia/contract/nelnet-061709.pdf.  The Servicing Agreement clearly demonstrates that only NSL contracted with the Department, and that NNI and NDS are not parties to the Servicing Agreement.

      *b. Irrespective of Whether Olsen Qualifies as an Intended Third-Party Beneficiary, Count I Constitutes an Impermissible Attempt to End-Run around the Higher Education Act's Enforcement Regime.*

Courts have consistently held that student loan borrowers lack a private right of action to enforce the HEA and its supporting regulatory framework. For example, in *Labickas v. Arkansas State University*, the Eight Circuit Court of Appeals concluded that neither an express nor an implied private right of action exists under the HEA, explaining:

> The HEA specifies that the Secretary of Education has the power to carry out the [HEA's] remedies; the Secretary has promulgated numerous and comprehensive regulations that regulate educational institutions' compliance with the HEA; and the statute and legislative history do not otherwise suggest congressional intent to create a private remedy.

78 F.3d 333, 334 (8th Cir. 1996). Other circuit court opinions are in accord. See, e.g., *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1224 (11th Cir. 2002) ("A private right of action would also not be consistent with the enforcement scheme provided by Congress, as it would run counter to Congress' express purpose of providing the Secretary of Education with exclusive enforcement authority to remedy violations of the HEA."); *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1485 (9th Cir. 1995) ("The implication of a private cause of action would seriously undercut, rather than complement, the Secretary's enforcement powers.") (quoting *Saint Mary of the Plains College v. Higher Educ. Loan Program, Inc.*, 724 F. Supp. 803, 808 (D. Kan. 1989)); *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 593 (4th Cir. 2005) (observing that "courts have consistently held that no private right of action is available for the HEA"); *L'ggrke v. Benkula*, 966 F.2d 1346, 1348 (10th Cir. 1992) ("No provision [of the HEA] provides for student enforcement or entitled to civil damages. Rather, as discussed

7

above, Title IV's provisions demonstrate that Congress vested exclusive enforcement authority in the Secretary of Education.").

Set against this backdrop, the Supreme Court unanimously held in 2011 that a purported third-party beneficiary could not sue to enforce a government contract where (1) the government contract merely incorporated existing statutory obligations and recorded the contracting parties' agreement to abide by them, (2) the claim for breach of contract was premised upon a supposed statutory violation, (3) the underlying statute did not provide for a private right of action, and (4) the suit was "in essence a suit to enforce the statute itself."  See *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 118 (2011) (discussing contract claim against drug manufacturers that allegedly charged health-care facilities in excess of the prices allowed under the Public Health Services Act).  In *Astra*, the "contractual term allegedly breached" derived exclusively from a federal statute, and not "any substantive obligation arising only from" the government contract.  *Id.* at 118-19.  Accordingly, the government contractors' "statutory and contractual obligations" were "one and the same."  *Id.* at 118.  In determining that the complaint failed to state a claim, the Court in *Astra* reasoned that "[t]he absence of a private right to enforce the statutory…obligations would be rendered meaningless if" a purported third-party beneficiary of a government contract "could overcome that obstacle by suing to enforce the contract's [identical] obligations instead."  *Id.*

Although the Court in *Astra* analyzed statutory duties imposed by (and government contracts executed pursuant to) the Public Health Services Act, federal district courts, including those within the Eighth Circuit, have applied the Supreme Court's logic to numerous analogous circumstances dealing with various other federal

laws. See, e.g., *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 820 F. Supp. 2d 953, 984 (N.D. Iowa 2011), *aff'd in part, rev'd in part on other grounds*, 773 F.3d 58, 64 (8th Cir. 2014) (dismissing seed producer's third-party beneficiary claim to enforce the United States Warehouse Act ("USWA"), as incorporated into license agreement between United States Department of Agriculture and grain elevator company, because allowing seed producer to enforce USWA "in the guise of a third-party contract action would render meaningless the absence of a statutory private right of action"); *McInroy v. BAC Home Loan Servicing, LP*, No. 10-4342 (DSD/SER), 2011 U.S. Dist. LEXIS 49868, at *6-7 (D. Minn. May 9, 2011) (dismissing mortgagor's third-party beneficiary claim to enforce Home Loan Modification Program ("HAMP") guidelines, as incorporated into contract between mortgage servicer and Fannie Mae, because mortgagor lacked private right of action to enforce HAMP); *York v. Wellmark, Inc.*, No. 4:16-cv-00627-RGE-CFB, 2017 U.S. Dist. LEXIS 199888, at *61 (S.D. Iowa Sep. 6, 2017) (citing *Astra* for the proposition that "[a]llowing private litigants to claim their insurer was unjustly enriched because it violated the [Patient Protection and Affordable Care Act ('ACA')] would be tantamount to recognizing a private right of action to enforce the ACA where Congress has not provided one"). And, notably, at least one court has dismissed a claim invoking the HEA on similar grounds. See *Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*, No. 04 Civ. 704 (RPP), 2005 U.S. Dist. LEXIS 9772, at *49 n.25 (S.D.N.Y. May 20, 2005) ("To find a cause of action for a third-party beneficiary breach of contract claim based on the HEA would subvert the HEA by allowing, in effect, a private right of action where one does not exist.").

According to Olsen, the Servicing Agreement requires Defendants to "comply with all applicable federal statutes and regulations." (ECF No. 1, ¶ 61) Olsen goes on to reference the HEA's statutory and regulatory duties related to processing IDR plan renewal applications, (ECF No. 1, ¶ 62) and then accuses Defendants of breaching those duties by improperly processing her February 2015 IDR plan renewal application "in violation of federal law." (See, e.g., ECF No. 1, ¶ 64) Thus, Olsen's own allegations clearly reveal that Count I is premised solely on Defendants' alleged "violation of federal law"—specifically, the HEA's IDR plan renewal application processing rules set forth in 34 C.F.R. § 685.221(e)(8)—and not "any independent substantive obligation arising only from" the Servicing Agreement. See *Astra*, 563 U.S. at 118-19. Consequently, the breach of contract claim asserted in Count I of Olsen's Complaint constitutes precisely the type of impermissible scheme designed to end-run around a Congressionally-prescribed enforcement regime that courts routinely reject. As a result, Count I of the Complaint fails to state a claim upon which relief can be granted.

### 2. Count II Should Be Dismissed as to All Defendants.

#### a. *No Contractual Relationship Exists between Defendants and Olsen.*

As discussed above, a contract cannot be enforced by a person who is not a party to or in privity with it. See generally *Hawkins Constr. Co. v. Peterson Contrs., Inc.*, 970 F. Supp. 2d 945, 952 (D. Neb. 2013) ("Privity is a requirement under Nebraska state law.") A "significant majority" of courts hold that privity of contract does not exist between loan servicers and borrowers and, as such, borrowers cannot hold loan servicers liable for purportedly breaching contracts between borrowers and lenders. *Mazzei v. Money Store*, 308 F.R.D. 92, 109 (S.D.N.Y. May 29, 2015); see also *Conder*

10

*v. Home Sav. of Am.*, 680 F. Supp. 2d 1168, 1174 (C.D. Cal. 2010) ("The fact that Aurora entered into a contract with HAS to service Plaintiff's loans does not create contractual privity between Aurora and Plaintiff."); *Hanson v. Amerihome Mortg. Co., LLC*, No. 2:17-cv-03691, 2017 U.S. Dist. LEXIS 212383, at *17-19 (S.D. W. Va. Dec. 28, 2017) (same); *Davis v. Navient Corp.*, No. 17-CV-00992-LJV-JJM, 2018 U.S. Dist. LEXIS 41365, at *8 (W.D.N.Y. Mar. 12, 2018) (same). Similarly, a broadly applicable principle of agency law dictates that where a contractual "obligation is that of a principal, a court cannot enforce the obligation against the agent as long as he is merely acting as agent." *Hecker v. Ravenna Bank*, 238 Neb. 810, 817, 468 N.W.2d 88, 94 (1991) (quoting *Savorelli v. Stone*, 168 Neb. 419, 428, 96 N.W.2d 222, 227 (1959)); Restatement 3d of Agency, § 6.01 (explaining that agent of disclosed principal cannot be held liable to third party for alleged breach of contract).

In Count II of the Complaint, Olsen acknowledges that Defendants are not parties to the "standard"[5] Promissory Note she executed in 2004, which she alleges is the "contract between [her] and the federal government" that governs her Federal Direct Consolidation Loan. (ECF No. 1, ¶ 19) Nevertheless, Olsen contends that Defendants are bound by the terms of her Promissory Note in light of a recent decision by the Sixth Circuit Court of Appeals in *Mirandette v. Nelnet, Inc.*, 720 Fed. Appx. 288 (6th Cir. 2018).[6] (ECF No. 1, ¶¶ 19, 73) Yet, Olsen's assertion relies on a fundamentally flawed interpretation of *Mirandette*, which cannot logically be construed to bind all loan

---

[5]  The terms of Olsen's "standard promissory note" are mandated by the Department and are, for the most part, uniform across all federal student loans.  See 20 U.S.C. § 1082(m)(1)(D)(i).
[6]  Aside from her interpretation of the holding in *Mirandette*, Olsen provides no other basis in fact or law that would justify binding Defendants to the terms of her Promissory Note.

servicers to the terms of every loan they service.[7]   In fact, the relevant holding in *Mirandette* turned on the court's procedural obligation, when ruling on a Fed. R. Civ. P. 12(b)(6) motion, to accept as true the plaintiff's allegation that "Defendants are a signatory to Plaintiff's [Master Promissory Note]."   See *Mirandette*, 720 Fed. Appx. at 293  (holding that because plaintiff alleged that defendants signed his promissory note, his breach of contract claim was "sufficient to withstand judgment on the pleadings" on the issue of contractual privity).   When viewed in its appropriate context, this particular holding in *Mirandette* is altogether unremarkable and, most importantly, completely inapplicable to the present circumstances, where the Complaint does not allege that any of the Defendants signed Olsen's Promissory Note.[8]   Simply put, nothing in *Mirandette* establishes contractual privity between Olsen and Defendants, and nothing about *Mirandette* distinguishes Count II from the well-established line of jurisprudence rejecting borrowers' efforts to hold loan servicers liable for breaching contracts between borrowers and lenders.   Accordingly, the Court should dismiss Count II for failing to state a claim upon which relief can be granted.

> b.  *Irrespective of Whether Defendants Were in Privity of Contract with Olsen, Count II Also Constitutes an Impermissible Attempt to End-Run around the Higher Education Act's Enforcement Regime.*

In nearly identical fashion to Count I, Count II of Olsen's Complaint sets forth the erroneous theory that, merely because Olsen's Promissory Note is "governed by

---

[7]  Olsen does not appear to argue that the doctrine of collateral estoppel should apply to Defendants (two of whom are also named defendants in *Mirandette*).   In any event, such an argument would fail for a multitude of reasons.

[8]  In addition to Olsen's assertion that the Promissory Note is a "contract between [her] and the federal government," (ECF No. 1, ¶ 19) she also alleges, in "and/or" fashion, that Defendants "tortiously and improperly interfered with the federal government's performance of the promissory notes."   (ECF No. 1, ¶ 77)  Olsen's tortious interference claim operates as yet another admission that Defendants are not signatories or parties to the Promissory Note, as it is axiomatic that "a party cannot interfere with its own contract."   *Dominium Ill. Three v. Arbor Dev. Group, Inc.*, No. A-00-1051, 2002 Neb. App. LEXIS 244, at *27 (Sep. 17, 2002) (citing *Huff v. Swartz*, 258 Neb. 820, 606 N.W.2d 461 (2000)).

applicable federal law," (ECF No. 1, ¶ 74) any deviation from federal law or regulation automatically triggers a breach of contract.  (ECF No. 1, ¶¶ 74-76)  Thus, Olsen concludes, Defendants' alleged violation of 34 C.F.R. § 685.221(e)(8) must be actionable as a breach of the Promissory Note.  (*Id.*)  But for reasons discussed above, Olsen cannot circumvent the HEA's enforcement regime and usurp the Secretary of Education's exclusive enforcement authority merely because the Promissory Note contains a boilerplate applicable law provision.   To the extent the Court does not dismiss Count II on other grounds, it should reject Olsen's attempted bootstrapping maneuver.  See, e.g., *Anderson v. Wells Fargo Home Mortg.*, No. 14-5013 ADM/JSM, 2016 U.S. Dist. LEXIS 23899, at *9 (D. Minn. Feb. 25, 2016) ("The Court finds that Plaintiff's breach of contract claim fails.  Plaintiffs cannot simply recast statutory claims as breach of contract causes of action based on the mortgage's general governing law provision.").

> ### c. Moreover, Even If Olsen's End-Run Scheme Were Theoretically Viable, the Regulatory Provision(s) Defendants Allegedly Violated Came into Effect After Olsen Executed the Promissory Note.

Count II suffers from a third fatal defect insofar as the specific regulation Olsen seeks to enforce did not take effect until several years following the date Olsen entered into the Promissory Note.   See *State Board of Educational Lands & Funds v. Haberman*, 191 Neb. 127, 128-29, 214 N.W.2d 266, 268 (1974) (discussing the inapplicability of subsequent statutory changes to existing contracts).  Olsen alleges that she executed the Promissory Note "in or around 2004," (ECF No. 1, ¶ 19, First ¶ 41) but the pertinent regulations, embodied at 34 C.F.R. § 685.221, did not take effect until 2009.   See Office of Postsecondary Education, Department of Education; *Federal*

13

*Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 73 Fed. Reg. 63232, 63259 (Oct. 23, 2008). Furthermore, the Department's amendments to § 685.221(e)(8) which Olsen relies for her claim did not take effect until 2013. See Office of Postsecondary Education, Department of Education; *Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 77 Fed. Reg. 66088, 66147 (Nov. 1, 2012). Olsen does not cite to any language in the Promissory Note explicitly incorporating subsequent changes to the law, nor does Olsen suggest that any parties to the Promissory Note intended as much. Therefore, because the Promissory Note's boilerplate applicable law provision does not incorporate § 685.221(e)(8), Count II fails to state a claim upon which relief can be granted.

> ### d. Olsen's Alternative Theory that Defendants Have Committed Tortious Interference Fails Because Tortious Interference Sounds In Tort, and Olsen Has Not Properly Pleaded Such a Tort Claim.

In the concluding paragraphs of Count II, for "Breach of Contract," Olsen alternatively alleges that, even if Defendants are not bound by the Promissory Note, they have nevertheless "tortiously and improperly interfered the federal government's performance" thereof. (ECF No. 1, ¶¶ 77-79) However, a cause of action for tortious interference sounds in tort, rather than in contract law. See *D & S Realty, Inc. v. Cutler*, No. A-09-036, 2003 Neb. App. LEXIS 5, at *12 (Ct. App. Jan. 14, 2003) (noting that tortious interference is "by definition a tort"); *Craw v. City of Lincoln*, 24 Neb. App. 788, 798 (2017) ("His allegations that others may have negligently influenced that agreement does not convert his contract claim into a tort claim, other than perhaps to claim a tortious interference with his contract rights."); *AllGood Entm't, Inc. v. Dileo Entm't &*

*Touring, Inc.*, 726 F. Supp. 2d 307, 314 (S.D.N.Y. 2010) ("AllGood's tortious interference claim against AEG quite self-evidently sounds in tort, not in contract law."). Hence, it is not clear that Olsen intends to formally assert a separate tort claim for tortious interference.

Further, Olsen does not allege facts sufficient to satisfy the elements for a tortious interference claim. See *Shank v. City of Kimball*, No. 7:08CV5004, 2009 U.S. Dist. LEXIS 4085, at *6 (D. Neb. Jan. 9, 2009) (listing the five elements needed to "establish a cause of action for tortious interference with contract under Nebraska law") (citing *Huff v. Swartz*, 258 Neb. 820, 825, 606 N.W.2d 461, 466 (2000)). Critically, a tortious interference claim derived from a breach of contract "accrues when the subject contract is breached, regardless of when the defendant supposedly induced the breach." *Hrock v. Farmland Indus.*, 4 Neb. App. 709, 714, 548 N.W.2d 367, 370 (1996) (quoting *Kartiganer Assoc. v. Town of New Windsor*, 108 A.D.2d 898, 899-900, 485 N.Y.S.2d 782, 784 (1985)). For the reasons discussed above, Olsen cannot identify any legally cognizable breach of the Promissory Note. Thus, to the extent Olsen means to plead a separate cause of action for tortious interference, she fails to state a plausible claim for relief.

> e. *Olsen's Alternative Theory that Defendants Have Committed Tortious Interference Also Fails Because Defendants Service Olsen's Loan on Behalf of the Department and, as Such, Are Legally Incapable of Tortiously Interfering with the Promissory Note.*

Additionally, any tortious interference claim against Defendants fails as a matter of law. By Olsen's own admission, Defendants "contract with the Department" to "perform all tasks associated with loan repayment, such as collecting payments, responding to customer service inquiries, providing loan documents to borrowers,

15

handling applications for loan deferment or forbearance based on financial hardship, and administering repayment programs designed to help borrowers effectively manage the increasing cost of higher education."   (ECF No. 1, ¶ 4)   The Complaint thus demonstrates that Defendants act as "an intermediary" and "provid[e] financial services" to the Department by "collect[ing] payments from borrowers" like Olsen and "disburs[ing] them to" the Department.  See *Wells Fargo Bank, N.A. v. Ash Org.*, No. 09-CV-188-MO, 2010 U.S. Dist. LEXIS 66542, at \*36 (D. Or. July 1, 2010).  Where, as alleged here, Defendants "service[] and administer[] loans on behalf of" the Department," they cannot be held liable for tortious interference because they are not "intermeddling strangers." *Id.*; see also *Parker v. BAC Home Loans Servicing LP*, 831 F. Supp. 2d 88, 92 (D.D.C. 2011) (holding that, where a loan servicer "collects payments from borrowers" and "disburses them to the" holder, the servicer acts as "an intermediary" and "generally cannot have committed the tort of intentional interference"); *Bradbury v. Network Enters.*, No. 4:12-CV-575 (CEJ), 2013 U.S. Dist. LEXIS 19308, at \*11 (E.D. Mo. Feb. 13, 2013) ("For example, third party beneficiaries and others with legitimate interest in the contract are neither parties nor strangers, and cannot be sued for tortious interference.").  Such an outcome reflects the common sense maxim that "a party cannot tortiously interfere with its own business relationship."  *Fastrich v. Cont'l Gen. Ins. Co.*, No. 8:16CV487, 2017 U.S. Dist. LEXIS 132947, at \*19 (D. Neb. Aug. 21, 2017) (dismissing tortious interference claim because defendant "is not a true third-party interferer").  Defendants are simply not the types of "strangers" or "intermeddlers" capable of committing tortious interference under the circumstances alleged in the Complaint, and any claim for tortious interference must fail for this independent reason.

16

**3. Counts III through V of the Complaint Should Be Dismissed as to all Defendants Because the Complaint Fails to Sufficiently Identify any Conduct by Defendants which Would Violate the Underlying State Statutes.**

In Counts III through V of the Complaint, Olsen asserts violations of several state consumer protection statutes.  As with Counts I and II, Olsen's goal in Counts III through V is to somehow enforce 34 C.F.R. § 685.211(e)(8).  But, unlike Counts I and II, Counts III through V constrain Olsen insofar as she must link her allegations against Defendants to statutorily-enumerated categories of banned practices.  As none of the state consumer protection laws invoked by Olsen specifically addresses IDR plan renewal application processing, Olsen attempts to couch her allegations in Counts III through V in careful language so as to match the statutes she seeks to invoke.  Thus, Olsen alleges that Defendants, by incorrectly processing her IDR plan renewal application, have "misrepresented" their "compliance with federal regulations," (ECF No. 1, Second ¶ 51) "falsely represented that their loan servicing operations had the sponsorship and approval of the federal government," (*Id.*, ¶¶ 110, 121), and employed a "scheme or device to defraud" by "obtaining additional monthly servicing fees from the federal government" under false pretenses.  (*Id.*, ¶¶ 113-114)

Olsen's first problem is that, while her NCPA and NUDTPA claims accuse Defendants of "falsely representing that" certain loan servicing practices "were consistent with federal law," (*Id.*, Second ¶¶ 52-53, ¶ 111) neither statute makes such conduct unlawful.    The NUDTPA proscribes more than 20 distinct categories of "deceptive trade practices," none of which includes misrepresentations as to one's consistency or compliance with federal law.  See Neb. Rev. Stat. § 87-302.  The NCPA,

17

though seemingly broader on its face,[9] appears in the chapter of the Nebraska Revised Statutes governing "Monopolies and Unlawful Combinations."  See NEB. REV. STAT. Ch. 59.   In fact, the Nebraska Supreme Court recently recognized that the NCPA is "intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies."  *Salem Grain Co. v. Consol. Grain & Barge Co.*, 297 Neb. 682, 699, 900 N.W.2d 909, 922 (2017); see also *Nelson v. Lusterstone Surfacing Co.*, 258 Neb. 678, 684, 605 N.W.2d 136, 142 (2000) (explaining that "the Legislature did not intend" for the CPA to apply "any commerce" when it passed the NCPA "as an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies").   Given the NCPA's antitrust purpose, the statute cannot reasonably be read to embrace Olsen's claims—which make no reference to monopolies or price-fixing—that Defendants misrepresented their compliance with federal law.

Next, Olsen's Complaint provides no factual allegations whatsoever supporting her claims that Defendants violated the NUDTPA and OUTPA by misrepresenting and/or causing confusion as to the federal government's "sponsorship and approval" of Defendants' "loan servicing operations."  (ECF No. 1, ¶¶ 110, 112, 121, 123)   While the NUDTPA and OUTPA each make it unlawful to misrepresent and/or cause confusion as to sponsorship and approval (see NEB. REV. STAT. § 87-302(a)(5)-(6) and OR. REV. STAT. § 646.608(1)(b)-(c)) Olsen fails to identify any acts or statements by Defendants that could be interpreted as representations concerning the federal government's sponsorship and approval.   Olsen cites several excerpts from NNI's 2016 10-K as her only example of Defendants' alleged misrepresentations of federal government

---

[9]  The NCPA provides that "unfair or deceptive acts or practices of any trade or commerce shall be unlawful."  NEB. REV. STAT. § 59-1602.

sponsorship and approval, but the quoted excerpts do not so much as hint at the issue of federal government sponsorship and approval. (*Id.*, ¶¶ 110, 121)  And, contrary to Olsen's hypothesis (*Id.*, ¶¶ 112, 123), Defendants' loan servicing methods—even their allegedly deficient IDR plan renewal application processing methods—do not themselves constitute representations at all, much less representations that Defendants' loan servicing methods enjoyed the sponsorship and approval of the federal government.[10]   Simply put, Olsen presents no factual allegations supporting her assertion that Defendants have misrepresented and/or caused confusion as to the federal government's sponsorship and approval.

Finally, Olsen's Complaint fails to sufficiently plead that Defendants violated the NUDTPA by employing a "scheme or device to defraud" by "obtain[ing] additional monthly servicing fees…under the false pretense that said actions were compliant with federal law." (*Id.*, ¶¶ 113-114)[11]  Because this particular claim sounds in fraud, Olsen must satisfy the stricter pleading standards of Fed. R. Civ. P. 9(b) by "stat[ing] with particularity the circumstances constituting fraud."  Generally, Fed. R. Civ. P. 9(b) requires the complaint to identify "the who, what, where, when, and how of the alleged fraud."  *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (internal quotation marks omitted).  "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the Rule."  *Id.*  Here, Olsen's bare

---

[10]  In Counts IV and V, Olsen appears to conflate federal *law* with the federal *government.*  According to Olsen, if Defendants simply state their intent to comply with federal *law*, it is tantamount to Defendants representing that they have the approval and sponsorship of the federal *government.*  Olsen's misunderstanding, taken to its logical conclusion, would produce absurd outcomes whereby anyone who misspeaks about one's compliance with the law would be subject to NUDTPA and OUTPA liability for misrepresenting and/or causing confusion as to one's governmental sponsorship and approval.

[11]  Olsen appears to be invoking NEB. REV. STAT. § 87-302(a)(16)(i), which prohibits the use of "any scheme or device to defraud by means of…obtaining money or property by knowingly false or fraudulent pretenses, representations, or promises."

conclusion that Defendants have violated the NUDTPA by "delaying or failing to process borrowers['] IDR applications under the false pretense that said actions were compliant with law" (ECF No. 1, ¶ 114) falls short of basic pleading requirements.[12]

In contorting her descriptions of Defendants' alleged acts so that they match the statutory labels and enumerated categories of prohibited practices, Olsen attempts to squeeze proverbial square pegs into round holes.   Olsen simply cannot bend the relevant statues far enough to encompass Defendants' alleged acts.   The Court should dismiss Counts III through V due to Olsen's failure to tie Defendants' alleged conduct to the types of practices covered by the underlying statutes.

### 4. Counts III through V of the Complaint Should Be Dismissed Because They Are Expressly Preempted by the Higher Education Act.

The Supremacy Clause of the United States Constitution[13] grants Congress "virtually unfettered power to preempt state laws…by enacting a statute containing an express preemption provision."   *Keller v. City of Fremont*, 719 F.3d 931, 939 (8th Cir. 2013) (quoting *Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012)) (internal quotation marks omitted).   Congress included such an express preemption provision in the HEA by providing that "[l]oans made, insured, or guaranteed pursuant to a program authorized by title IV of the [HEA] shall not be subject to any disclosure requirements of any state law."   20 U.S.C. § 1098g.   Section 1098g embodies the Congressional imperative for uniformity in student loan servicing, especially where "[f]ederal law provides a carefully crafted disclosure regime specifying what information must be provided in the context of federal loan programs."   Office of the Secretary, Department

---

[12]  Defendants submit that Olsen's § 87-302(a)(16)(i) claim would even fail under Fed. R. Civ. P. 8(a)(2)'s liberal pleading standards.
[13]  U.S. Const. art. VI, cl.2.

of Education; *Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers*, 83 Fed. Reg. 10619, 10621 (March 12, 2018) (hereinafter, the "*2018 Department Interpretation*") (citing 20 U.S.C. §§ 1078-3(b)(1)(F), 1083(e)(1) and (2), and 34 C.F.R. §§ 668.41(b), 674.31, 674.42, and 682.205).

When assessing the preemptive effect of § 1098g, it is essential to consider the Department's liberal construction of the phrase "disclosure requirements" as encompassing all "informal or non-written communications to borrowers as well as reporting to third parties such as credit reporting bureaus." *Id.* As one federal district court recently explained, § 1098g preempts "any State law requiring lenders to reveal facts or information not required by Federal law." *Nelson v. Great Lakes Educ. Loan Servs.*, No. 3:17-CV-00183-NJR-SCW, 2017 U.S. Dist. LEXIS 208331, at *12-13 (S.D. Ill. Dec. 19, 2017). It follows that a state law claim "based on a purported failure of disclosure runs headlong into express statutory preemption provisions," and any "additional requirements are barred whether they are enacted legislatively or implied judicially in the context of a tort suit." *2018 Department Interpretation*, at 10621. Moreover, "State servicing laws attempt[ing] to impose new prohibitions on misrepresentation or the omission of material information…also run afoul of the express preemption provision in 20 U.S.C. § 1098g." *Id.*

The recent *Nelson v. Great Lakes Educational Loan Services, Inc.* case aptly demonstrates the breadth of preemption under § 1098g. There, the plaintiff alleged that her student loan servicer violated the Illinois Consumer Fraud and Deceptive Business Act by (1) omitting and misrepresenting information concerning her eligibility to

21

participate in an IDR plan, (2) "misrepresenting, concealing, or omitting the detrimental effects of entering or continuing a forbearance," and (3) "holding themselves out as 'experts,' holding themselves out as having all student loan borrowers' information, and holding themselves out as working in the best interest of student loan borrowers." *Nelson*, 2017 U.S. Dist. LEXIS 208331, at *15-18.

The court distilled the plaintiff's overarching theory down to the following: "under Illinois state law, Great Lakes should have disclosed additional information to me and other borrowers."  *Id.* at *15.  Specifically, the plaintiff's claims stemmed from her belief that "Great Lakes' employees should have disclosed (or revealed) they were not 'experts' and were working on behalf of Great Lakes, should have disclosed all options to borrowers, and should have disclosed that forbearance may not be the 'best option' for all borrowers."  *Id.* at *16.  Viewed through that prism, the court jettisoned the borrower's state law claims, which it concluded were, "at bottom," nothing more than "disguised failure-to-disclose claims."  *Id.*

Likewise, in *Chae v. SLM Corporation*—the seminal case on § 1098g preemption—the Ninth Circuit Court of Appeals analyzed a plaintiff's claim that her student loan servicer employed unfair and deceptive practices in violation of California's Unfair Competition Law and Consumer Legal Remedies Act.  See *Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010).  More precisely, the plaintiff asserted that the servicer's billing statements and loan applications misrepresented that her loans conferred "rights, remedies, and obligations" which did not, in fact, exist.  *Id.* at 942.  The Ninth Circuit considered the plaintiff's "allegations in substance to be a challenge to the allegedly-misleading method Sallie Mae used to communicate with plaintiff's about its practices."

22

*Id.* at 942-43.   Hence, "[a]t bottom, the plaintiff's misrepresentation claims [were] improper-disclosure claims," preemption of which the plaintiff could not avoid "simply by relabeling."   *Id.* at 943 (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)); see also *Linsley v. FMS Inv. Corp.*, No. 3:11cv961(VLB), 2012 U.S. Dist. LEXIS 53735 (D. Conn. Apr. 17, 2012) (finding plaintiff's claim that student loan servicer violated the Connecticut Unfair Trade Practices Act claim by "falsely representing the law governing the amount of time" and "number of payments" required for borrower to enter income-contingent repayment plan or consolidation was preempted under § 1098g).

Olsen's state statutory claims in Counts III through V bear striking resemblance to the preempted claims in *Nelson*, *Chae*, and *Linsley*.   Though Olsen styles Counts III through V as statutory tort claims for misrepresentation, they are, in effect, the converse of new and additional state law requirements that student loan servicers would need to follow when communicating with and making disclosures to borrowers.   Put differently, Counts III through V constitute "failure-to-disclose" and "improper-disclosure" claims, which § 1098g expressly preempts.   As a result, the Court should dismiss Counts III through V for failure to state a claim upon which relief can be granted.

**5.  Count III, which Arises under the Nebraska Consumer Protection Act, Should Be Dismissed as to all Defendants Because NEB. REV. STAT. § 59-1617(1) Exempts the Entire Spectrum of Defendants' Purportedly Deceptive and/or Unfair Conduct from the Nebraska Consumer Protection Act.**

The NCPA contains an exemption, located at NEB. REV. STAT. § 59-1617(1), which removes from the scope of the NCPA any allegedly unfair or deceptive "actions or transactions otherwise permitted, prohibited, or regulated under the laws administered by…any…regulatory body or officer acting under statutory authority of this state or the

United States."  Courts broadly construe the exemption set forth in § 59-1617 to apply to any act generally "subject to regulation."  See, e.g., *Mirandette v. Nelnet, Inc.*, 720 Fed. Appx. 288 (6th Cir. 2018) (quoting *Kuntzelman v. Avco Financial Services of Nebraska, Inc.*, 206 Neb. 130, 291 N.W.2d 705, 708 (1980)); *In re ConAgra Foods, Inc.*, 908 F. Supp. 2d 1090, 1103-04 (C.D. Cal. 2012) ("[T]he exception to the Nebraska [Consumer Protection Act] statute is broader than federal preemption, and applies to all conduct regulated by federal agencies.")  Several Nebraska Supreme Court cases give contour to § 59-1617 by fleshing out the meaning of the phrase "subject to regulation" and, in virtually every instance, courts have opted for an expansive reading of § 59-1617.  See, e.g., *Hydroflo Corp. v. First Nat'l Bank*, 217 Neb. 20, 33, 349 N.W.2d 615, 622 (1984) (applying exemption, even though bank's conduct was neither specifically proscribed nor permitted, because the Department of Banking and Finance exercised "general supervision and control over banks" and had "broad authority over proper banking standards"); *Little v. Gillette*, 218 Neb. 271, 277-78, 354 N.W.2d 147, 152 (1984); *McCaul v. American Savings Co.*, 213 Neb. 841, 846-47, 331 N.W.2d 795, 798-99 (1983) (applying exemption where "each of the loans involved…was reported to and at least indirectly approved by the Department of Banking and Finance"); *Kuntzelman*, 206 Neb. at 132-36, 291 N.W.2d at 706-08 (1980) (applying exemption to lending institution's conduct which, though not specifically banned, was nonetheless subject to the Department of Banking and Finance's inspection and disciplinary powers under the Installment Loan Act).  For the following reasons, § 59-1617 exempts all of the Defendant's challenged conduct in Count III.

      *a. The United States Department of Education and the Consumer Financial Protection Bureau, Among Others, Directly and Pervasively Regulate Student*

*Loan Servicing Practices, Including the Processing of Forbearances and IBR Plan Applications.*

Pursuant to the HEA, the Department "is responsible for all aspects of the lending process from loan origination through repayment, including the proper servicing and collection" of student loans made under the Direct Loan Program.  83 Fed. Reg. 10619, 10620 (citing 20 U.S.C. § 1087e).  The HEA specifically "directs the Secretary to award servicing contracts only to entities" deemed "qualified" and with "extensive and relevant experience and demonstrated effectiveness."  *Id.*  (citing 20 U.S.C. § 1087f(a)(2)).  Further, the "HEA and the Department's regulations provide comprehensive rules governing the Direct Loan Program, and the Department's contracts with loan servicers further specify the program's rules and requirements."  *Id.*  These rules and requirements address, *inter alia*, income-based and income-contingent repayment plans, forbearances, and disclosures required to be given to student loan borrowers.  See, e.g., 34 C.F.R. §§ 685.208 (Direct Loan Program repayment plans generally); 685.209 (Direct Loan Program income-contingent repayment plans); 685.221 (Direct Loan Program income-based repayment plans); 685.205 (Direct Loan Program forbearances); 682.205 (required disclosures by Federal Family Education Loan Program ("FFELP") lenders, made applicable to the Direct Loan Program by 20 U.S.C. § 1087e).  Thus, the HEA subjects student loan servicers to rigorous oversight, and arms the Department with a panoply of administrative tools to exercise its sweeping authority over servicers.  See, e.g., 34 C.F.R. § 682.208 (requiring servicers to engage in due diligence); 34 C.F.R. § 668.81–99 (authorizing the Department to audit, fine, suspend, and terminate servicers participating in HEA programs); 34 C.F.R. § 682.700–12 (same, for servicers participating in the FFELP).

25

Additionally, the CFPB exercises broad concurrent regulatory oversight of student loan servicers.  See 12 U.S.C. § 5514.  The CFPB's regulatory powers include the right to examine servicers' methods, order servicers to cease certain practices, and penalize servicers for practices the CFPB deems unlawful.  See *id.*  Notably, the CFPB has filed lawsuits against student loan servicers to address the very issue at the core of Olsen's Complaint,[14] including Count III: student loan servicers' processing of forbearances and IDR plans.  See, e.g., *CFPB Sues Nation's Largest Student Loan Company Navient for Failing Borrowers at Every Stage of Repayment*, CONSUMERFINANCE.GOV (Jan. 18, 2017), *available at* https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-nations-largest-student-loan-company-navient-failing-borrowers-every-stage-repayment/ (discussing the CFPB's lawsuit based, in part, on Navient's alleged "steering" of borrowers into forbearance and failure "to adequately inform [borrowers] of critical deadlines" during the IDR plan recertification and renewal process); see also *Annual Report of the CFPB Student Loan Ombudsmen*, CONSUMERFINANCE.GOV (October 2017), *available at* https://files.consumerfinance.gov/f/documents/cfpb_annual-report_student-loan-ombudsman_2017.pdf (discussing, at great length, claims that student loan servicers

---

[14]  Likewise, multiple state attorneys general have recently sued student loan servicers over their allegedly improper forbearance "steering" and IDR plan processing.  See *AG Healey Sues to Protect Public Service Loan Forgiveness*, MASS.GOV (Aug. 23, 2017), *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2017/2017-08-23-pheaa-lawsuit.html (discussing the Massachusetts Attorney General's claim that "PHEAA has overcharged student borrowers and prevented them from staying on track with [IDR] plans"); Stacy Cowley, *California Will Be Fourth State to Sue Navient Over Student Loans,* NEW YORK TIMES (June 28, 2018), *available at* https://www.nytimes.com/2018/06/28/business/navient-student-loans-california.html (discussing lawsuits filed against student loan servicer by California, Illinois, Pennsylvania and Washington based on, *inter alia*, improper processing of IDR plans and improper "steering" of borrowers into forbearance).

had improperly processed borrowers' IDR plans and steered them into forbearances inappropriately).

In *Mirandette*, the Sixth Circuit applied NEB. REV. STAT. § 59-1617 to a borrower's NCPA claim against NNI and NSL on the grounds that, even though "there are no regulations governing the specific conduct Mirandette alleges Defendants engage in," the Department and the CFPB nevertheless "have regulatory oversight of loan servicers" and, further, the Department "has considerable regulatory authority over student loans." *Mirandette v. Nelnet, Inc.*, 720 Fed. Appx. 288, 290-91 (6th Cir. 2018). The Sixth Circuit reasoned that the Department's general "power to regulate" was itself "sufficient to trigger the [NCPA] exemption provision." *Id.* at 291. Thus, *Mirandette* demonstrates both the general breadth of § 59-1617, as well as the specific application of § 59-1617 to NCPA claims involving alleged misconduct by student loan servicers.

Here, the application of § 59-1617 is even more obvious than in *Mirandette*, because the conduct[15] giving rise to Olsen's NCPA claim—namely, Defendants' alleged making of disclosures to Olsen regarding the IDR plan renewal process, and Defendants' alleged mishandling of Olsen's IDR plan renewal application—is already governed in intricate detail by the HEA and its accompanying regulations. For instance, 34 C.F.R. § 685.221(e)(3)(i) requires servicers to notify borrowers of their obligation to submit certain IDR plan recertification materials within a particular timeframe; § 685.221(e)(3)(ii) requires servicers to warn borrowers of the consequences (such as the capitalization of unpaid accrued interest) if the borrowers fail to timely submit their

---

[15] Although Olsen frames her NUDTPA claim as targeting Defendants' purported misrepresentation of their federal government approval, it is obvious that Olsen believes the federal government's approval or disapproval of Defendants (and, in turn, Defendants' liability under the NUDTPA) depends upon whether Defendants have complied with the Department's regulations governing IDR plan renewal applications.

IDR plan recertification materials; § 685.221(e)(8)(i) requires servicers to "promptly" process timely IDR plan renewal applications and maintain borrowers' then-current payment schedules during the IDR plan renewal process; and § 685.221(e)(9)(i) authorizes forbearances with respect to certain payments made following borrowers' late submissions of IDR plan renewal applications, and prevents servicers from capitalizing interest that accrues during such periods of forbearance.  Indeed, by asserting that "Defendants violated the [NCPA] by falsely representing that" certain actions "were consistent with federal law," Olsen explicitly concedes that Defendants' alleged violations of the NCPA are coextensive with, and virtually indistinguishable from, their alleged violations of federal law.[16]

In light of the foregoing, it cannot be seriously argued that the HEA and its regulations do not already "permit, prohibit, or regulate" Defendants' alleged conduct, nor can it be plausibly said that Defendant's alleged conduct—assuming *arguendo* that it is not directly addressed by existing law—escapes the regulatory oversight of the Department and the CFPB (not to mention state attorneys general).  Consequently, the Court should dismiss Count III, because Defendants' alleged conduct fits squarely within the exception of NEB. REV. STAT. § 59-1617 and, hence, falls outside the purview of the NCPA.

b. *The Securities and Exchange Commission Directly Regulates Nelnet, Inc.'s Investor Communications, Including the Statements in Its Annual 10-Ks.*

---

[16]  Elsewhere in Count III, Olsen alleges that "Defendants falsely represented that their loan servicing operations were in compliance with federal regulations," (ECF No. 1, Second ¶ 51) and that Defendants gave borrowers advice concerning forbearances that was "not authorized under federal law for this purpose," (*Id.*, Second ¶ 52).  In each of these allegations, Olsen necessarily concedes that Defendants' purported conduct is already governed under existing federal law, and subject to oversight by multiple federal and state regulators.

Additionally, Count III contends that Defendants' 2016 10-K "falsely represented that their loan servicing operations were in compliance with federal regulation."  (ECF No. 1, Second ¶ 51)[17]  Yet, because these statements appear in NNI's 10-K, they are subject to the oversight of the Securities and Exchange Commission (the "SEC"), which wields broad regulatory authority with respect to public companies' periodic reports.  See, e.g., *What We Do*, SEC.GOV ("Crucial to the SEC's effectiveness…is its enforcement authority.  Each year the SEC brings hundreds of civil enforcement actions against individuals and companies for violation of securities laws.  Typical infractions include…providing false or misleading information about securities and the companies that issue them."), *available at* https://www.sec.gov/Article/whatwedo.html (last visited July 9, 2018).  In particular, the SEC's Division of Corporate Finance administers "all matters" concerning the establishment and "adherence to standards of reporting and disclosure" by public companies, as well as "[a]ll matters" related to the "examination and processing of periodic reports filed pursuant to" 15 U.S.C. § 78m.  17 C.F.R. § 200.18(b).  And, pursuant to Regulation S-K, set forth at 17 C.F.R. Part 229, the SEC polices virtually every aspect of public companies' periodic disclosures.  See also 17 C.F.R. § 200.19b (delegating "all enforcement activities" to the SEC's Division of Enforcement).  Once again, the alleged conduct which Olsen asserts contravenes the NCPA is "otherwise permitted, prohibited, or regulated under laws administered by" a "regulatory body or officer acting under statutory authority of…the United States," and is

---

[17]  In fact, the specific quote Olsen cites from NNI's 2016 10-K does not support any inference that Defendants made any deceptive or false representations of any nature.  NNI merely stated that the "Company has designed its servicing operations to comply with the [HEA], and it regularly monitors the Company's operations to maintain compliance."  (ECF No. 1, Second ¶ 51)  Olsen fails to allege that Defendants did *not* design their servicing operations to comply with the HEA, or that Defendants do *not* monitor their operations to maintain compliance with the HEA.  Nor could Olsen credibly make such a contention, given that her Complaint alleges little more than a single infraction of one of the HEA's many provisions.

consequently exempt from the reach of the NCPA. As a result, the Court should dismiss Count III for failure to state a claim insofar as it alleges that Defendants' 10-Ks violate the NCPA.

### 6. Count IV, which Arises under the Nebraska Uniform Deceptive Trade Practices Act, Should Be Dismissed as to All Defendants Because It Suffers from Additional Incurable Defects.

#### a. Olsen Never Purchased Goods or Services from Defendants, as Required by the Nebraska Uniform Deceptive Trade Practices Act.

According to NEB. REV. STAT. § 87-303.10, a "civil action arising under the [NUDTPA] may be brought only within four years from the date of purchase of goods or services." By its plain terms, § 87-303.10 establishes both the types of transactions that can give rise to potential NUDTPA liability (*i.e.,* purchases of goods or services), as well as the applicable limitations period for NUDTPA claims (*i.e.,* four years from the date of purchase). Olsen's NUDTPA claim fails on both fronts.

First, neither Olsen's original acquisition of the Federal Direct Consolidation Loan from the Department nor Defendants' servicing of that loan constitutes a "purchase of goods or services" by Olsen within the meaning of the NUDTPA. Although the NUDTPA does not define "goods or services," courts in other jurisdictions have interpreted similar statutes and concluded that loans and loan servicing do not involve a sale of goods or services to borrowers.[18] In *Mirandette*, the only reported case faced

---

[18] *See Ibreheme v. Capital One, N.A.*, 933 F. Supp. 2d 86, 108 (D.D.C. 2013) (finding that loan servicers' alleged misapplication of payments was not a "trade practice"—broadly defined to include "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer or effectuate, a sale, lease, or transfer, of consumer goods or services"—under the District of Columbia Consumer Protection Procedures Act); See, e.g., *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006, 1025-26 (S.D. Iowa 2009) (holding that loans, even if "accompanied by ancillary services, do not come within the meaning of goods or services in the" California Legal Remedies Act); *Deerman v. Fed. Home Loan Mortg. Corp.*, 955 F. Supp. 1393, 1399 (N.D. Ala. 1997) ("No court has held that a loan is a good or service under [the Alabama Deceptive Trade Practices Act], and this court will not be the first to do so. The court is of the opinion, therefore, that a mortgage loan is not a good or service

with the issue of whether loans and loan servicing came within the NUDTPA's ambit, the court noted the total absence of any case law "applying the [NUDTPA] to loan payments or suggesting that loan servicing constitutes a good or service."  *Mirandette v. Nelnet, Inc.*, 720 Fed. Appx. 288, 292 (6th Cir. 2018).  And, in dismissing the plaintiff's NUDTPA claim, the *Mirandette* court observed that the NUDTPA does not extend to every supposedly deceptive practice, but rather "proscribes an enumerated list of conduct that generally covers misrepresentations in sales."  *Id.*  As such, that enumerated list could not be read to embrace loan servicing practices—even supposedly deceptive ones—as they did not involve a sale of goods or services.  *Id.* ("[N]one of the enumerated practices describe the late crediting of loan payments.")

The circumstances of this case warrant the same outcome as in *Mirandette*.  In her Complaint, Olsen alleges that Defendants "falsely represented that their loan servicing operations had the sponsorship and approval of the federal government" (ECF No. 1, ¶ 110) and "obtained additional monthly servicing fees from the federal government through [their] scheme of delaying or failing to process borrowers['] IDR applications under the false pretense that said actions were compliant with federal law,"

---

under the Alabama DTPA."); *Dowers v. Nationstar Mortg., LLC*, 852 F.3d 964, 972 (9th Cir. 2017) (explaining that the Nevada Deceptive Trade Practices Act "governs transactions relating to 'goods and services,' and a real estate loan is neither a good nor a service within the meaning of this statute") (internal citations omitted); *Bottoni v. Sallie Mae, Inc.*, No. C 10-03602 LB, 2011 U.S. Dist. LEXIS 61626, at *11-13 (N.D. Cal. June 6, 2011) (holding that student loan was not a contract "for the retail purchase of personal property or services"); *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 725 (5th Cir. 2013) (analyzing a claim under the Texas Deceptive Trade Practices Act and holding that "[g]enerally, a pure loan transaction lies outside the DTPA because money is considered to be neither a good nor a service"); *Rojas v. Wells Fargo Bank, N.A.*, 571 Fed. Appx. 274, 279 (5th Cir. 2014) (holding that plaintiff's Texas Deceptive Trade Practices Act claim failed because "the basis of her claim is the subsequent loan servicing and foreclosure activities, rather than the goods or services acquired in the original transaction"); *Humphrey v. Citibank, N.A.*, NO. 2:12-CV-00148-MPM-JMV, 2013 U.S. Dist. LEXIS 137465, at *18 (N.D. Miss. July 2, 2013) (dismissing Missouri Consumer Protection Act claim because plaintiff failed to allege "that she purchased any goods or services from Defendants, or even that a mortgage loan can constitute a 'good' or 'service' for purposes of the MCPA").

(*Id.*, ¶ 114), but she never suggests that she purchased any goods or services. Even if one were ignore the distinction courts have drawn between loan servicing and typical goods and services, and assume *arguendo* that the servicing of a student loan could conceivably qualify as a sale of "goods or services," Olsen's NUDTPA claim still fails, because it was the Department, and not Olsen, that hired Defendants to service the loan. See *Mirandette v. Nelnet, Inc.*, No. 1:16-CV-50, 2016 U.S. Dist. LEXIS 106066, at *13 (W.D. Mich. Aug. 11, 2016), *aff'd in part on other grounds, rev'd in part*, 720 Fed. Appx. 288 (6th Cir. 2018) ("Moreover, to the extent Defendants perform a service, they do so for the lender pursuant to the terms of their contract with the lender to service loans.") The paucity of any indication that Olsen purchased goods or services from Defendants renders the NUDTPA claim in Count IV fatally defective.

> ### b. Olsen's Nebraska Uniform Deceptive Trade Practices Act Claim Is Also Barred by the Applicable Statute of Limitations.

Second, in addition to the inapplicability of the NUDTPA to loan servicing practices, Olsen did not bring her claim "within four years from the date of purchase." Olsen admits that she obtained the Federal Direct Consolidation loan more than a decade ago, "[i]n or around 2004." (ECF No. 1, ¶ 19) It follows that Olsen's ability to sue under NUDTPA, if any, expired in 2008. See, e.g., *Mirandette v. Nelnet, Inc.*, No. 1:16-CV-50, 2016 U.S. Dist. LEXIS 106066, at *12 (W.D. Mich. Aug. 11, 2016), *aff'd in part on other grounds, rev'd in part*, 720 Fed. Appx. 288, 292 (6th Cir. 2018) ("Assuming for purposes of the instant analysis that obtaining a loan constitutes a 'purchase of goods or services,' the limitations period would have commenced in 2008, when Mirandette signed the [promissory note].") Therefore, Olsen's NUDTPA claim is barred by the statute of limitations in NEB. REV. STAT. § 87-303.10.

  *c. Olsen Lacks Standing to Enforce the Nebraska Uniform Deceptive Trade Practices Act Because She Is Not a "Person Likely to Be Damaged" in the Future by Defendants' Allegedly Deceptive Practices and Thus Cannot Assert a Viable Claim for Injunctive Relief.*

Third, the NUDTPA restricts authorized action to equitable remedies, and only offers injunctive relief with respect to prospective injuries.  See NEB. REV. STAT. § 87-303 ("A person likely to be damaged by a deceptive trade practice of another may bring an action for, and the court may grant, an injunction under the principles of equity against the person committing the deceptive practice."); *Wolfbauer v. Ocwen Loan Servicing, LLC*, No. 4:15CV3141, 2016 U.S. Dist. LEXIS 38541, at *10 (D. Neb. Mar. 24, 2016) ("Private actions under the [NUDTPA]…are for prospective relief."). Accordingly, dismissal of a NUDTPA claim is proper where the Complaint merely "asserts claims based on damages already incurred."  *Ugonwa Azike v. E-Loan, Inc.*, No. 8:09CV37, 2009 U.S. Dist. LEXIS 49666, at *9 (D. Neb. June 11, 2009); see also *Reinbrecht v. Walgreen Co.*, 16 Neb. App. 108, 114, 742 N.W.2d 243, 248 (2007) ("Reinbrecht now knows the truth regarding the price of the postage stamps sold by Walgreens.  Therefore, any deception or damage to Reinbrecht occurred in the past and Reinbrecht cannot suffer future damages as a result of Walgreens' alleged deceptive practices.")

Here, Olsen's Complaint fails to allege "the likelihood of future harm sufficient to assert a viable claim for injunctive relief."  *Reinbrecht*, 16 Neb. App. at 114.  Although Olsen includes a perfunctory request for "an order enjoining Defendants' unfair, unlawful, and/or deceptive practice," (ECF No. 1, ¶ 116) she omits any facts that would

allow the Court to infer that injunctive relief would prevent future harm.[19]   Indeed, accepting the allegations in the Complaint as true, Olsen "now knows the truth" regarding the federal government's sponsorship or approval of Defendants' loan servicing practices, and therefore she "cannot suffer future damages as a result of" Defendants' supposed deception. *Id.*; see also *Wolfbauer*, 2016 U.S. Dist. LEXIS 38541, at *10 ("Even if the Court were to infer some deceptive practice by Ocwen based upon Wolfbauer's allegations, his claim concerns *past* conduct.  Wolfbauer is not a 'person likely to be damaged' by the conduct, and his allegations do not give rise to a private action under the [NUDTPA].").   Furthermore, even if injunctive relief could prevent Defendants from employing a "scheme or device to defraud" by "obtain[ing] additional monthly servicing fees *from the federal government*," (ECF No. 1, ¶¶ 113-114) (emphasis added) Olsen lacks standing[20] to seek such an injunction because she is not a "person likely to be damaged" by such conduct.  See *Brown v. Grandmother's, Inc.*, No. 4:09CV3088, 2010 U.S. Dist. LEXIS 13625, at *16-17 (D. Neb. Feb. 16, 2010) ("A showing that there is a likelihood of future injury is essential for standing where, as here, a plaintiff is seeking injunctive relief (as opposed to damages for past wrongs).").  For all (or any one of) the foregoing reasons, the Court should dismiss Count IV.

---

[19]  On this point, it is important to note that Olsen does not base her NUDTPA claim on the Defendants' alleged misprocessing of IDR plan renewal applications *per se*, but rather on Defendants' supposed misrepresentations concerning the federal government's approval of Defendants' loan servicing methods. Given that Olsen purports to know about the federal government's alleged non-approval of Defendants loan servicing methods, she is not at risk of any prospective harm, even in a hypothetical scenario where Defendants continue to misrepresent their governmental sponsorship.

[20]  Olsen's standing problem with respect to her claim that Defendants have employed a "scheme or device to defraud" the federal government (see ECF No. 1, ¶¶ 113-14) is both statutory (insofar as Neb. Rev. Stat. § 87-303 explicitly limits the right to sue to persons who are "likely to be damaged") as well as constitutional (insofar as Article III imposes a redressability requirement).   Consequently, Olsen's NUDTPA claim fails under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

**7. Count V, which Arises under the Oregon Unfair Trade Practices Act, Should Be Dismissed as to All Defendants Because It Is Barred by the Applicable Statute of Limitations.**

Any action brought by a private party under the OUTPA must be commenced "within one year from the discovery of the unlawful method, act or practice." OR. REV. STAT. § 646.638(6). Hence, under the discovery rule, the "statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care should have known the facts which would make a reasonable person aware of a substantial possibility" that a cause of action exists. *Ruiz v. Hammer & Nails, LLC*, No. 2:10-CV-1021-SU, 2013 U.S. Dist. LEXIS 138956, at *5 (D. Or. Sep. 27, 2013) (quoting *Gaston v. Parsons*, 318 Or. 247, 256, 864 P.2d 1319, 1324 (1994)) (internal quotation marks omitted); *Moreno v. Bank of Am., N.A.*, No. 3:11-cv-1265-HZ, 2012 U.S. Dist. LEXIS 59256, at *30 (D. Or. Apr. 27, 2012) ("Plaintiff fails to allege any facts, or make a viable argument, that the discovery of any alleged [OUTPA] violation could not have occurred upon review of the loan documents he executed in 2007.")

Olsen's OUTPA claim is untimely for the reason that Defendants allegedly engaged in unlawful trade practices, if ever, far more than one year prior to June 8, 2018, the date on which Olsen filed the Complaint. First, Olsen asserts that NNI's 2016 10-K misleadingly "represented that [Defendants'] loan servicing operations had the approval of law." (ECF No. 1, ¶ 121) However, NNI filed its 2016 10-K with the SEC on February 27, 2017—more than 15 months before Olsen filed the Complaint. See Nelnet, Inc., 2016 10-K Annual Report (Feb. 27, 2017), *available at* https://www.sec.gov/Archives/edgar/data/1258602/000125860217000020/nni-123116x10k.htm. Second, Olsen claims that Defendants "routinely and falsely

represented to borrowers that their loan accounts should be placed into forbearance status in order to accommodate Defendants' delays in processing IDR plan applications."  (ECF No. 1, ¶ 122)  But Olsen only alleges that Defendants made such a representation to her on one occasion, in "late April of 2017,"[21] more than a year before she filed the Complaint.  (ECF No. 1, Second ¶ 41)  Third, Olsen contends that Defendants misrepresented that various actions prohibited by the HEA and its implementing regulations "had the approval of the federal government."  (*Id.*, ¶ 123) Although Olsen never bothers to identify whom Defendants supposedly made such misrepresentations to, or when Defendants allegedly made them, the circumstances suggest only one logical possibility:  That these particular misrepresentations must have been made, if ever, in 2015, when Defendants supposedly cancelled Olsen's IDR plan, placed her loan into forbearance status to accommodate its processing delays, and capitalized the unpaid accrued interest on Olsen's loan.  (*Id.*, Second ¶¶ 36-42, ¶ 124) Again, this challenged conduct occurred, if at all, approximately three years before Olsen filed the Complaint.

Nothing in the Complaint remotely suggests that the one-year statute of limitations set forth in OR. REV. STAT. § 646.638(6) should be tolled.  In particular, Olsen fails to allege that she was unaware of Defendants' purported misrepresentations at the time Defendants made them, or that she could not have, in the exercise of reasonable care, discovered Defendants' purported misrepresentations more than a year before

---

[21]  Based on the records in Defendants' possession, as well as the broader context of Olsen's allegations (see ECF No. 1, Second ¶¶ 36-42) Defendants believe that Olsen's reference to "late April of 2017" is a typo, and that Olsen intended to reference April of 2015.  Either way, Olsen's claim was more than one year old as of the date of the Complaint.

she filed the Complaint.  Accordingly, the Court should Dismiss Olsen's OUTPA claim on the grounds that it is barred by the applicable one-year statute of limitations.

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Joint Motion to Dismiss all claims asserted in Plaintiff Jessica Olsen's Class Action Complaint.

Dated: July 19, 2018.                    **PERRY, GUTHERY, HAASE & GESSFORD, P.C., L.L.O.**

By:    /s/ Charles F. Kaplan
Daniel F. Kaplan, #17714
Charles F. Kaplan, #25779
233 South 13th Street, Suite 1400
Lincoln, Nebraska 68508
Tel.: (402) 476-9200
Fax: (402) 476-0094
dkaplan@perrylawfirm.com
ckaplan@perrylawfirm.com
*Counsel for Defendants Nelnet, Inc., Nelnet Diversified Solutions, LLC, and Nelnet Servicing, LLC*

37

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of July, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent notification to the following:

David A. Domina
DOMINA LAW GROUP PC LLO
2425 South 144th Street
Omaha, NE 68144
Tel.:   (402) 493-4100
Fax:   (402) 493-9782
DAD@dominalaw.com

Daniel A. Edelman
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER,
& GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603
Tel.: (312) 739-4200
Fax:   (312) 419-0379
dedelman@edcombs.com
cmiller@edcombs.com

Anthony Fiorentino
FIORENTINO LAW OFFICES, LTD.
180 N. LaSalle Street, Suite 2440
Chicago, IL 60602
Tel.:   (312) 853-0050
Fax:   (312) 853-3254
anthony@fiorentinolaw.com

I further certify that I have mailed by United States Postal Service the foregoing document to the following non-CM/ECF participants: None.

_/s/ Charles F. Kaplan_____
Charles F. Kaplan